OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant was charged with attempted murder in the second degree, attempted assault in the first degree, assault in the second degree and possession of a weapon with intent to use *576 unlawfully in connection with the January 29, 2002 shooting of Huston Pondexter. At trial the People sought to introduce the recordings of two telephone calls to 911 made by two witnesses reporting observations of the shooting on January 29, 2002, at 2:30 p.m. at 138th Street and Cypress Avenue, where the events involving Pondexter were alleged to have occurred.
The confrontation issues raised by the prosecutor’s application were controlled or affected by Crawford v Washington (541 US 36 [2004]), decided by the United States Supreme Court on March 8, 2004. The trial in this case began on March 18, 2004. The court precluded admission of one tape while allowing admission of the other in redacted version. The case proceeded to trial and was decided by the jury. This opinion sets out the findings and conclusions of the court with respect to the admissibility of the statements on the two 911 tapes. One tape was inadmissible at trial because it recorded a statement that was the product of “interrogation,” and because, under the United States and New York State Constitutions, the statement was testimonial under a test that accommodates both the historical development of the right of confrontation and the purpose of that right. The statement on the second tape was admissible because the declarant was present at trial for cross-examination and New York law did not otherwise preclude the admission of the statement into evidence.
A. Crawford
In Crawford, the Supreme Court considered whether the Confrontation Clause of the United States Constitution Sixth Amendment prohibits admission of out-of-court statements for their truth without cross-examination. Crawford held that the Confrontation Clause prohibits the admission of an out-of-court testimonial statement of a declarant against a defendant in a criminal case unless the declarant is present at trial and the defense has an opportunity to cross-examine the declarant, or the defendant has had a prior opportunity to cross-examine an unavailable declarant.[1] The Supreme Court rejected the use of a judicial finding of reliability as the basis for admitting hearsay evidence and required confrontation. (541 US at —, 124 S Ct at 1370.)
*577 The decision holds that testimonial evidence is what must be confronted, but deliberately leaves the scope of “testimonial” undefined. The Court did explicitly describe the “core class” of testimonial statements as “at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.” (541 US at —, 124 S Ct at 1374.) It wrote that the involvement of government officials in the taking of potential testimony or in conducting essentially investigative and prosecutorial functions produces evidence that falls squarely within the class of testimonial hearsay. (541 US at —, — n 7, 124 S Ct at 1365, 1367 n 7.) Noting the investigative and prosecutorial functions of government officers, the Court said that the involvement of any such officer in the production of testimonial evidence presents a risk. (541 US at —, 124 S Ct at 1365.) The Court identified three types of historically based nontestimonial statements: coconspirator statements, business records, and dying declarations. As for the last, dying declarations, the Court questioned whether testimonial dying declarations (as contrasted with nontestimonial dying declarations) were admissible, but stated that even if they were admissible on historical grounds, they were sui generis. (541 US at — n 6, 124 S Ct at 1367 n 6.)
State law reliability tests become relevant when a statement is nontestimonial and admissible under the Sixth Amendment without cross-examination. State law evidence rules are also applicable if a statement is admissible because it can or has been cross-examined, but state law requires the evidence be redacted or precluded.
B. The First Call Was Inadmissible
1. The Contents of the Call
The first emergency call on the 911 tape was made by a male observer who could not be located by the prosecution and was therefore unavailable for cross-examination at trial. The issue therefore was whether the 911 call was testimonial and consequently inadmissible.
The call was received on January 29, 2002 at 2:42:20 p.m. by an identifiable 911 operator and states:
“operator: Police 1290. Is this [an] emergency?
“caller: I just saw a man running with a gun at 138th
“operator: What borough?
“caller: 137 and Cypress. He had a red shirt on *578 . . . bald head
“operator: What borough, sir?
“caller: Pardon me?
“operator: What borough is this for?
“caller: Oh, the Bronx, sorry.
“operator: The Bronx.
“caller: Yeah, 137, 138 and Cypress. He’s got a red shirt on, hispanic, bald-headed.
“operator: What direction?
“caller: Towards 138th Street and Cypress.
“operator: 138th Street and Cypress. What was he wearing?
“caller: A red shirt and he’s bald-headed.
“operator: A red shirt and he’s bald-headed.
“caller: Yeah.
“operator: What about the bottom?
“caller: Eh?
“operator: What about the bottom? What kind of pants? Jeans?
“(Noise)
“caller: Oh, he’s shooting at him, he’s shooting at him.
“operator: OK.
“caller: He’s shooting at him.
“operator: He’s chasing the guy, right?
“caller: Yup. (Noise) You hear it?
“operator: I hear it. I hear it. OK.
“caller: He’s killing him, he’s killing him, he’s shooting him again.
“operator: He’s shooting at him or he shot him?
“caller: He shot him and now he’s running. And he shot him two or three times. Yes.
“operator: Where’s he running to?
“caller: He’s running toward 138th Street.
“operator: Hold on, let me get a ambulance on line. Hmmm?
“(Ring.)
“male voice: 0709.
“operator: OK. What was that?
“male: 0709.
“caller: I gotta hang up because people, people are *579 gonna think I’m out calling the cops. And they’ll think it’s me.
“operator: OK. All right sir, no problem. OK. Thank you. I think I got it to relay.”[2]
The 911 operator asked questions about the shooter’s location, description, and direction of movement, all necessary for the police to conduct their investigation. The tape shows that the caller supplied information to the 911 operator in response to the operator’s questions and that he also gave relevant information before the question was asked.
2. The 911 Call is the Product of Interrogation
The issue is whether a 911 call to police officers, law enforcement officers, or their agents reporting an ongoing crime and describing the perpetrator is testimonial. The analysis required by Crawford begins with the question of whether the statements in a 911 call are the product of interrogation. Because it was unnecessary on the facts of Crawford to provide a complete definition of “interrogation,” the Court left the outside parameters of the definition unresolved.
Webster’s An American Dictionary of the English Language (1828), which was used by the majority opinion in Crawford to define “witness” and “testimony” (541 US at —, 124 S Ct at 1364), defines interrogation as “the act of questioning,” “examination by questions,” “a question put,” and “inquiry.” “Interrogate” is defined as “to question,” and “to examine by asking questions.”
Further, examination shows the word interrogate is derived from the Latin verb interogare, to question: “inter” means between and “rogare” to ask. The word was used in grammar in the 16th century. (Oxford Dictionary of Word Histories [Chatrell ed Oxford Univ Press 2002]; Partridge, Origins: A Short Etymological Dictionary of Modern English, at 569 [Crown 1983].)
In 1913, interrogate was defined in Webster’s New International Dictionary of the English Language as “to ask formally; to question; to examine by asking questions; to interrogate as a witness.” Its synonyms are to question or ask.
More recent definitions include the words systematic or formal, but do so without eliminating the earlier definition. (See American Desk Dictionary and Thesaurus [Oxford 2002].)
*580 The circumstances of some 911 calls, particularly those reporting a crime, are within the definition of interrogation. In New York City the caller to 911 reaches one of two public safety answering services. The operator generally first asks, upon taking the call, “what is the emergency?” The recipient of the call, a police officer or civilian employee of the police department, needs particular information. Repeated announcements as well as the regular fare of television and movies have made members of the public keenly aware about what information must be supplied when reporting a crime. The New York City Police Department Internet Web site states:
“What should you do if you see a crime occurring?
“• Call 911 immediately.
“• Be observant and make mental notes.
“• Are there any weapons involved?
“• What is the address?
“• Any physical characteristics such as height, weight, race, beard, or scars?
“• Any clothing description?
“• How many people involved?
“• Are the persons involved on foot or in a vehicle?” (<www.nyc.gov/html/nypd/html/misc/pdfaq2.html>.)
A view of random Internet Web sites demonstrates that the New York City Police Department is not alone in preparing the public to use 911 calls to report crimes. Sources tell people what information will be requested by the emergency operator, and also what information will be expected from a caller to 911, even absent a question by the operator answering a particular call. For example, the Harvard University Web site reads:
“•A brief description of what occurred
“• Where the incident occurred
“• When the incident occurred
“• Whether the suspect(s) had a weapon
“• Where and when the suspect(s) were last seen
“• What the suspect(s) looked like
*581 “• Gender
“• Race
“• Age
“• Height
“• Weight
“• Hair Color/length
“• Clothing including shoes worn
“• Facial Hair
“• Tattoos, scars” (<www.hupd.harvard.edu/what_ to_include.phb>).
The Lampasas, Texas, site reads:
“How to Report a Crime
“The following is the order the Lampasas Police Department prefers to receive your information. This order may differ in other jurisdictions.
“• Type of crime
“• Location of crime
“• Crime in progress or when it occurred
“• Description of vehicle
“• Description of suspect
“• Suspect armed?
“• Direction of travel
“• Give your name, address, and phone number
“• Stay on line until you are told to hang up” (<www.cityoflampasas.com/bins/site/templates/ default.asp?objectid=B91601B0%2D8&area_2= departments%2Fpohce%2Freportingcrimes&N C= 6224X>).
The Pittsylvania County, Virginia, site reads:
“Dial 9-1-1
“• Tell the operator what the emergency is
“• Wait for further instructions from the operator
“• Don’t hang up until the operator tells you to . . .
“What information will the operator need?
*582 “• The location where assistance is needed
“• Your name and phone number
“• The nature of the emergency
“• Descriptions of suspects, or additional information
“1. Where? — Where is this occurring?
“2. What? — What is happening?
“3. When? — Is this happening now?
“4. Who? — Who is the victim, suspect, etc.?
“5. Why? — Do you know why this is happening? i.e. depression?
“6. Weapons? — Are there any weapons involved[?]
“DESCRIPTIVE INFORMATION
“PEOPLE
“• Sex
“• Race
“• Height
“• Weight
“• Age
“• Clothing
“• Any distinguishing features (glasses, facial hair, scars)
“VEHICLES
“• Color
“• Make
“• Model
“• Body Style (2 door, station wagon, etc.)
“• License number
“Which way did the suspect leave?
“Were they running, or in a vehicle?
*583 “Were they going north, south, east, or west?” (<www.pittgov.org/e911/howto.htm>.)
The police department collects information about crimes through callers to 911 who either are aware of the needed information because they have been told by public communications or because they are specifically asked by operators. The method for taking the calls falls within the definition of interrogation.
Crawford refers to “formal” statements. (541 US at —, 124 S Ct at 1364.) The procedures in connection with the 911 calls meet the definition of formal. They follow established procedures, rules, and patterns of information collection; they are conducted in due form. (See Webster’s Third New International Dictionary 893 [1986].) There is a regularized routine to the 911 calls in which crimes are reported. The transcript of this call shows the information was elicited in a particular way and order and that the operator was asking questions in the accepted pattern. Formality cannot be limited to courtroom procedures for then police and prosecutor questioning of a witness at the precinct, the witness’ home, the prosecutor’s office, or other locations would be outside the scope of confrontation protections.
As will be noted in section 5 of this opinion, callers to 911 reporting crimes are likely to know the use to which the information will be put. Like the 911 caller on this case, they often do not identify themselves because they are afraid to disclose their identities or to become involved. The police ask for names and telephone numbers, but do not pursue the matter if the information is not disclosed.
The circumstances in this case fall within the Supreme Court’s definition of interrogation, producing a statement that is testimonial evidence and inadmissible without cross-examination.
3. The History and Purpose of Confrontation Shows that the Content of 911 Calls Reporting Crimes Must Be Subject to Cross-Examination
Crawford also raises the question of what statements, other than those resulting from interrogation, are hearsay required to be tested by confrontation. (Friedman, Confrontation: The Search for Basic Principles, 86 Geo LJ 1011, 1015-1016 [1998] [hereinafter cited as Confrontation].) The analysis here, based on the history and the legal significance of the right of confrontation, leads to the conclusion that an appropriate definition of hearsay evidence that must be cross-examined to be admissible at trial includes 911 calls reporting crimes.
*584 Crawford’s reliance on English law shows the Court’s view of the relevance of English common law of the 18th century for deciding what the federal confrontation right means. Recent scholarship examining decisions of the English courts is therefore significant to resolving the admissibility question under the Sixth Amendment to the Federal Constitution. New York State’s law and statutes are relevant for determining admissibility under the State Constitution.
An analysis of the scope of the confrontation right is tied to considering the history of the hearsay rule. There is no pure history of the confrontation rule; the two are inexorably intertwined. (See John Langbein, The Origins of Adversary Criminal Trial, at 233-242, 245-247 [Oxford Univ Press 2003] [hereinafter cited as Origins]; Confrontation, 86 Geo LJ, at 1022.) While the analysis demanded by Crawford requires an untangling of confrontation and reliability, the latter only recently determinative of the admissibility of hearsay evidence, it makes no sense to read Crawford as rendering hearsay history irrelevant.
a. English History
Newly examined judicial documents, judicial diaries and treatises have led to the conclusion that the exclusion of hearsay evidence became a regular part of English common law in criminal cases by the end of the 18th century. (Origins, at 242.) Before that time hearsay evidence was often admitted in English courts despite decisions and treatises criticizing the practice. (Langbein, Historical Foundations of the Law of Evidence: A View from the Ryder Sources, 96 Colum L Rev 1168, 1186-1190 [1996] [hereinafter cited as Historical Foundations].) The law before the end of the 18th century was concerned primarily with the admissibility of documentary evidence and the resulting issues of determining the authenticity of writings. Further, because parties in interest could not be witnesses, the issue of whether a witness was competent to testify was also of paramount importance. There were however, concerns about hearsay because the writer of the document was not before the court under oath. (Historical Foundations, at 1172-1176, 1194; Gilbert, Evidence, at 107 [1754] [printed on the title page of the volume is the statement that it is “published from an exact copy taken from the original manuscript”].)[3]
By the end of the 18th century, as witness disqualification ended and pleading rules changed, oral testimony and the law *585 of evidence, including the hearsay rule, became an integral part of court proceedings. (Historical Foundations, at 1194.)[4] More and more witnesses were allowed to testify and cross-examination replaced the oath as the fundamental safeguard for the receipt of oral evidence. (Id.)
What is significant is that Langbein’s research led him to conclude that “concern about the want of cross-examination remained a muted theme in criminal justice throughout the eighteenth century,” that the first judicial mention of the lack of cross-examination as a reason for excluding evidence came in 1789, and that “[t]he ultimate rationale for the hearsay rule ([which is] serving the process value of promoting cross-examination) was not settled until well into the nineteenth century.” (Langbein, Origins, at 233, 238.)
Crawford refers specifically to the use at trial of pretrial depositions taken by magistrates or justices of the peace as authorized by the Marian Committal Act of 1555, to demonstrate a condemned use of hearsay. In the 1800s English magistrates or justices of the peace conducted preliminary examinations of prosecution witnesses and if the evidence was sufficient, held the accused for trial. The written examinations or depositions of victims, witnesses and the accused were sent to the judge. According to Langbein, records show that in the second half of the 17th century the depositions were read to the jury if favorable to the prosecution, but that the records do not show the reading of depositions to be a regular procedure in the 18th century. Langbein suggests that a decline in reading the depositions was due to the Marian Committal Act requirement that prosecution witnesses, as well as the accused, be made available for trial, thereby reducing the need for the deposition because the witness was present. (Langbein, Shaping the Eighteenth-Century Criminal Trial: A View From the Ryder Sources, 50 U Chi L Rev 1, 82-83 [1983].)
In any event, the use of hearsay was not limited to depositions. Statements of a child victim to an adult were admissible. Langbein also refers to the use of “pursuit hearsay,” hearsay evidence about how an accused was detected or detained” (Langbein, Origins, at 202), and “how an accused attracted suspicion *586 on himself or how a particular investigation had been conducted.” {Id. at 239.) Also, cases cited demonstrate that hearsay evidence was not limited to the written documents taken at pretrial proceedings. (Langbein, Origins, at 242, 243.)
In a 1791 judicial decision, King v Dingler (2 Leach 561, 168 Eng Rep 383), it was held that a deposition from a witness who had died or was ill and unavailable for trial could not be read at the accused’s trial unless the accused had been present when the deposition was taken and had the opportunity to cross-examine. As a result, by 1800 depositions were taken from prosecution witnesses in the defendant’s presence or read to the witness and confirmed by the witness in the defendant’s presence and the defendant was given the right of cross-examination. A statute, Jervis’ Act, formalized this in 1848. (Bentley, English Criminal Justice in the Nineteenth Century, at 29, 30-37, 218 n 4 [Hambledon Press, London 1998].) While the opportunity for cross-examination was given, effective cross-examination was limited because the defendant either had had no counsel or counsel’s cross-examination was limited. {Id.)
In 18th century England, the judges examined the witnesses at trial and, while hearsay was admissible, the judge was free to tell the jurors about defects in the proof and his view of the value of the proof. Over time, the job of examining witnesses passed from the judge to defense lawyers who began to appear frequently for the accused. The increased presence of defense attorneys (for those who could afford them) became the practice when lawyers increasingly assisted the prosecution witnesses in the preparation of their cases.[5] 6 The appearance of defense lawyers leveled the playing field, and the defense lawyers had as their primary function cross-examination of witnesses and demanded access to witnesses for that purpose.
What is significant is that when the lawyers were available they sought to preclude evidence, to cross-examine, to impeach the witness, and also to inteiject arguments that could otherwise not be made, challenge identifications or property claimed as the subject or means of crime, raise questions about intent, explore motives for testifying, and, perhaps, use the questioning “for partisan and truth-defeating ends.” (Origins, at 245, 246, 291-299; Jonakait, at 82-92; Friedman and McCormack, Dial-In Testimony, 150 U Pa L Rev 1171, 1207 [2002].) Confrontation was much more than cross-examination.
*587 The unstoppable expansion of defense counsel’s role at the trial confirms that, in practice, determining the reliability of testimony was not the only purpose of cross-examination. Cross-examination of both written and oral evidence became the keystone in proceedings.
This focus on the opportunity to cross-examine was part of the legal context at the time of the writing of the Sixth Amendment Confrontation Clause in 1789 and the subsequent ratification process. The history does not support the position that hearsay subject to confrontation is limited to depositions, affidavits and other formal documents. The development of the adversarial process included more than documents. Indeed, cross-examination developed as the process was changed to rely not on documents but on oral presentation from witnesses in court and from activist judges to probing defense counsel.
b. New York History
Scholarly analysis concludes that the American decision to include the right to confrontation in its judicial system has little to do with the specifics of the English experience and the common-law system. Rather, the conclusion is that confrontation and the consequent limits on hearsay evidence are connected to the adversarial system in the American courts made part of the federal and state bills of rights to protect against government. The entire package of rights, including counsel, notice, and making a defense, as well as confrontation, was a check on the government and provided a way for the accused defendant to present the defense position. (Jonakait, 27 Rutgers LJ, at 77-81.)
Under the package of rights theory, English common-law history does not per se carry the day to define what is admissible without cross-examination.
New York’s history on this issue reflects a pattern of protection of the right of confrontation. The right of confrontation is first found in explicit terms in the bill of rights in Revised Statutes of New York of 1829 (Rev Stat of NY, part I, ch IV § 14 [1st ed 1829]; see 1 Lincoln, Constitutional History of New York State, at 734, 738 [1906]; People v Williams, 35 Hun 516, 519 [1885]).[6]
*588 The Code of Criminal Procedure, passed on June 1, 1881 (L 1881, ch 442), superceded all prior laws for administration of criminal proceedings. Included as section 8 (3) was the defendant’s right to “be confronted with the witnesses against him in the presence of the court.” Later amendments to the code confirmed the significance of the confrontation requirement under New York law. The confrontation right was explicitly included in the Civil Rights Law of 1909 and the current New York Constitution of 1938.
Although the commentator’s note to the bill of rights passed in 1829 states that the confrontation section, section 14, was derived from the Federal Constitution, the New York courts made clear that the federal confrontation provision did not apply to state court proceedings (People v Fish, 125 NY 136, 152 [1891]; People v Penhollow, 42 Hun 103, 105 [5th Dept, Gen Term 1886]; People v Williams, 35 Hun 516, 519, 521-522 [1st Dept 1885]), and because there was no New York State constitutional provision, the Legislature could change the New York statutes relating to the confrontation right. (People v Williams, 35 Hun at 520; see People v Elliott, 172 NY 146 [1902].) Nonetheless, the right of confrontation was deemed fundamental and the wide scope of New York’s protection of the right of confrontation is seen in the decisions on the permissible use of hearsay evidence.
The decisions concerning dying declarations are relevant for their concern about the dangers of hearsay. Such declarations were considered necessary evidence, but the courts were concerned about the fairness of using them. Although admissible, the dying declarations were treated with great skepticism. In People v Kraft (148 NY 631 [1896]), dealing with the statement of the deceased who died at the hospital after an abortion, the Court reversed a conviction for murder because the trial judge told the jury that a dying declaration had the same weight as testimony given in court. The Court wrote that although dying declarations are an exception to the rule against “second *589 hand evidence” (id. at 633), even if admissible based on public policy, they do not have “all the guarantees which surround evidence given under oath in a court of justice” (at 634).
“While there is an assumption that the presence of death is equal to the oath, the law does not, and cannot, regard the [dying declaration] as of the same value and weight as the evidence of a witness given in a court of justice, under all the tests and safeguards which are there afforded for discovering the truth ... by the means of cross-examination, and the jury have the opportunity of observing the demeanor of the person whose testimony is relied upon.” (Id. at 634.)
Cross-examination, said the Court, is as essential as the oath and the absence of cross-examination is a “serious deprivation.” (Id.)
In People v Corey (157 NY 332 [1898]), the Court held the Code of Criminal Procedure had not abolished the dying declaration exception, which allowed such statements “in evidence for time out of mind.” (Id. at 347-348.) “Dying declarations are received from necessity, in order to prevent a failure of justice, upon the theory that the belief of impending death is equivalent to an oath.” (Id. at 349.) But, said the Court, the admissibility is based on belief of responsibility after death, “[a]ll men, however, do not entertain that belief.” (Id.) Cross-examination “is quite as essential in the process of eliciting the truth as the obligation of an oath.” (Id.) Telling the jury that a declaration is to “receive as much credit as testimony given under oath in an open court is erroneous.” (Id.)
In People v Falletto (202 NY 494 [1911]), the Court reiterated its concern with the use of dying declarations. Writing that the exception is based on a “public necessity” (id. at 500), and that the absolute requirements are clear proof of the certainty of speedy death and that the declarant has no hope of recovery (id.), the Court concluded:
“Dying declarations are dangerous, because made with no fear of prosecution for perjury and without the test of cross-examination, which is the best method known to bring out the full and exact truth. The fear of punishment after death is not now regarded as so strong a safeguard against falsehood as it was when the rule admitting such declarations was first laid down. Such evidence is the mere statement of what was said by a person not under oath, *590 usually made when the body is in pain, the mind agitated and the memory shaken by the certainty of impending death. A clear, full and exact statement of the facts cannot be expected under such circumstances, especially if the declaration is made in response to suggestive questions, or those calling for the answer of ‘Yes’ or ‘No.’ Experience shows that dying declarations are not always true.” (Id. at 499; see also People v Nieves, 67 NY2d 125 [1986] [and cases cited therein].)
Nieves states that the dying declaration is admissible only in homicide prosecutions to limit its use to cases of necessity.
Civil decisions, while not bound by confrontation rights afforded in criminal cases, reflect similar distrust by New York courts of hearsay,[7] particularly the use of declarations of a potential but dying witness. In Jackson v Kniffen (2 Johns 31 [Sup Ct, NY County 1806]), two of three judges found that oral evidence of statements made by a testator just before his death asserting that the will was made under duress was inadmissible. One of the judges wrote “the right of cross-examination is invaluable, and not to be broken in upon.” (Id. at 35.) Noting that evidence can be “entirely frittered away” (id.), by cross-examination, the judge said a “still higher value must be set on proofs, made in presence of both parties, compared with ex parte declarations.” (Id.)
In Gray v Goodrich (7 Johns 95 [Sup Ct, NY County 1810]), the court found that the admission of testimony about a statement made by a deceased person who was a witness to the disputed horse sale was reversible error. The court relied on the absence of the oath: “This evidence was clearly inadmissible. The law requires the sanction of an oath to all parol testimony.” (Id. at 96.) The exceptions were pedigree, prescription and custom, and the deceased who spoke being under oath or in extremis.
*591 In Wilson v Boerem (15 Johns 286 [Sup Ct, NY County 1818]), the court found it improper to admit into evidence in a civil case involving a promissory note the declaration of a deceased made when he was in extremis. The court held that the evidence was admissible only in homicide cases because the “opportunity to cross-examine a witness is a high and important right and ought not to be violated, except for the most imperious necessity.” (Id. at 293.)
Decisions concerned with other exceptions to the right to confront a witness at the trial make clear that cross-examination is treated as a critical right. In People v Newman (5 Hill 295 [1843] [in Supreme Court on review by certiorari]), the jury had disagreed resulting in a mistrial and at the time of the second trial, the witness had left the state and was not available. The trial court allowed into evidence the previously sworn testimony. On review the court found that only the witness’ death would permit use of the testimony without the witness’ presence, especially in criminal cases.
The statutory exceptions to confrontation at the trial, like the one discussed in Newman, were included in the 1881 Code of Criminal Procedure. The Legislature included a limited exception to the presence of the defendant in court:
“the charge has been preliminarily examined before a magistrate, and the testimony reduced by him to the form of a deposition in the presence of the defendant, who has, either in person or by counsel, cross-examined, or had an opportunity to cross-examine, the witness, or, where the testimony of a witness on the part of the people, who is unable to give security for his appearance, has been taken conditionally according to sections 219 and 220, the deposition of the witness may be read upon its being satisfactorily shown to the court that he is dead, or insane, or cannot with due diligence be found within the state.” (Code Crim Pro § 8.)
A literal parsing of the first exception set out, that for previously cross-examined depositions, did not require that the declarant be dead, insane, or unavailable. Nonetheless, the courts held that the death, incapacity or unavailability of the declarant must be shown to the court for the sworn disposition to be admitted.
In Williams (35 Hun 516 [1885]), the court, citing the 1843 Newman decision, wrote that if
*592 “at some stage in the progress of the criminal proceeding the accused should be confronted with the witness and afforded the opportunity for their cross-examination, and when he has been so confronted and that opportunity has been afforded to him, that the evidence may afterwards, under certain circumstances certainly, be read upon the trial of an indictment subsequently presented against him.” (35 Hun at 517.)
The circumstances justifying the use of the evidence were the witness’ death, illness, insanity or inability to testify. (Id. at 518.) In the 1886 decision in People v Penhollow (supra), the witness died between the first incomplete trial and the second trial. The court wrote (at 106) that “in cases of necessity,” the rights of the accused are protected if he “has been once confronted by the witness against him in any stage of the proceedings upon the same accusation and has had an opportunity of a cross-examination, by himself or by counsel, in his behalf.” (See also People v Gilhooley, 108 App Div 234 [1st Dept 1905], affid without op 187 NY 551 [1907]; People v Fish, 125 NY 136, 162 [1891]; People v Vitusky, 155 App Div 139 [1st Dept 1913].)
The amendments of 1887 (L 1887, ch 422, § 2) directed that the conditional examinations taken pursuant to Code of Criminal Procedure § 219 be conducted on notice to the defendant and his attorney, that the defendant be present at the examination “to confront the witness produced against him,” and that if the defendant has no counsel that one would be appointed for him.
Then in 1902, in People v Elliott (172 NY 146 [1902]), the Court of Appeals found proper the reading at a second trial of sworn testimony by a deceased witness given at a first trial which had been reversed on appeal. The Court stated there was no Code of Criminal Procedure provision authorizing the procedure, but found authorization in the Code of Civil Procedure and prior precedents like Williams, Penhollow and Newman. On the death of the witness, “testimony [is admissible when] carefully [sworn] upon a former trial, at which the accused was represented by counsel, who was permitted the right of cross-examination . . . .” (People v Elliott, 172 NY at 152-153.)
The amendment to section 8 of the Code, enacted in 1915 (L 1915, ch 196, § 1), for the first time divides the exceptions by separate letter designation, (a), (b), and (c), and adds an exception to the Confrontation Clause based on public records of a *593 tenement house (an apparent business records exception). Finally, the amendment of 1935 adds a new provision in paragraph (d) to section 8 (3) adopting the rule in Elliott:
“where the defendant has previously tried on an indictment or information embracing the same charge, the testimony of any witness who has testified upon such prior trial may be read in evidence upon any subsequent trial of the same indictment or information, upon its being satisfactorily shown to the court that the witness is dead or insane, or can not with due diligence be found within the state.” (L 1935, ch 744, § 1.)
The cases and statutes place a high value on the right of confrontation and protect that right by the guarantee of counsel which in New York is broader than the federal guarantee.
4. The Tests Proposed
Under the new federal test articulated in Crawford, statements considered testimonial could come into evidence only with confrontation; if nontestimonial they are admissible subject to the state evidentiary laws. This new federal test leaves “testimonial” largely undefined. Crawford does not give many clues to the answer. However, what is paramount in Crawford is the importance of the confrontation right.
The recognition of the right’s importance to the fairness of a judicial proceeding is so basic that it cannot be dissociated from the right to counsel. Both the English history and the development of New York law as set out above are demonstrative of this linkage.
A definition of “testimonial” that takes the Supreme Court and the New York courts at their word when they highly value the confrontation right cannot be limited to formal documents, affidavits or depositions.[8] Various tests have been offered for deciding whether a specific piece of proposed evidence is hearsay requiring it to be confronted. (Crawford v Washington, 541 US at —, 124 S Ct at 1364.)
One suggestion is that a declaration is testimonial only if the witness made the pretrial statement with testimonial intent. If at the time the statement is made the declarant “correctly understands” it will not play a role in any litigation, then it is *594 not testimonial even if it is later used. If the declarant believes the statement will be presented at trial or if the statement is made under formalities prescribed by the system for creating information for the factfinder, the statement is testimonial. (Friedman, Confrontation: The Search for Basic Principles, 86 Geo LJ at 1016, 1039.)
This test appears to have been later modified by its author to include an objective state of mind rather than the declarant’s subjective mind set. The revised test states that a pretrial statement is inadmissible without cross-examination if the circumstances would lead a reasonable person to realize that the statement is likely to be used in investigation or prosecution of a crime. (Friedman and McCormack, Dial-In Testimony, 150 U Pa L Rev at 1241.)
A test more in accord with the highly prized protection of the right of confrontation is the objective one of whether the pretrial statement of a person other than the defendant, admitted through the testimony of another person, on tape or in writing, was made primarily for another purpose. If so, it need not be confronted. Under the test, for example, traditional business records, hospital diagnostic information, public records, res gestae, and coconspirator statements would be admissible at trial without cross-examination.[9] Whether some other statement falls within the test is to be determined by the circumstances in which the statement was made.
5. 911 Calls to Report Crimes
The admission of 911 calls in New York is premised on the theory of spontaneous declaration, excited utterance or present sense impression.[10] The admissibility of evidence based on these exceptions has been keyed to the analysis in Wigmore’s treatise (see People v Brown, 70 NY2d 513, 518 [1987]) and the preCrawford Supreme Court decisions and is based on assumed reliability without confrontation. (See e.g., People v Johnson, 1 NY3d 302, 306, 308 [2003]; People v Buie, 86 NY2d 501 [1995]; People v Brown, 80 NY2d 729 [1993]; People v Brown, 70 NY2d 513 [1987]; People v Nieves, 67 NY2d at 135; People v Edwards, 47 NY2d 493 [1979]; People v Caviness, 38 NY2d 227, 230-231 [1975]; People v Marks, 6 NY2d 67, 76-77 [1959], cert denied 362 US 912 [1960]; People v Del Vermo, 192 NY 470 [1908].)
*595 Crawford requires a reexamination of the basis for treating spontaneous declarations as admissible hearsay, including statements in a 911 call reporting a crime. Calls to 911 to report a crime are testimonial under the test set out. When a 911 call is made to report a crime and supply information about the circumstances and the people involved, the purpose of the information is for investigation, prosecution, and potential use at a judicial proceeding; it makes no difference what the caller believes.
The 911 statement is made orally, but it is recorded as would a statement made to a police officer, a prosecutor or a prosecutor’s stenographer who then writes it down. The statements on the 911 tapes are preserved as official documents. In New York a summary copy (a sprint report) is made and preserved separately from the tape. The preserved conversations on tape are available by subpoena. The tapes must be delivered as Rosario material if the witness is available and testifies. If a tape is lost or improperly or prematurely destroyed, an adverse inference may be available. The tapes must be given to the defense if they contain exculpatory information.
The 911 call reporting a crime preserved on tape is the modern equivalent, made possible by technology, to the depositions taken by magistrates or justices of the peace under the Marian Committal Act. Like the victims and witnesses before the Bang’s courts an objective reasonable person knows that when he or she reports a crime the statement will be used in an investigation and at proceedings relating to a prosecution. Indeed, callers knowing how the information will be used, often refuse to disclose their identity. The caller here declined to reveal his name and said he did not want other people to know who he was. The operators do not urge the caller to disclose their name or location. In fact, technology allows the operator to see the telephone number of the land line telephone on which the call is made and efforts are also under way to do the same with cell phones. With proper investigation declarants might be more frequently found.[11]
The 911 calls reporting crimes are also within the New York Confrontation Clause which should preclude their use. The admission of spontaneous declarations was based on a rationale of reliability that is now in disrepute and very likely was always not a fair test of the accuracy of the information.
*596 The New York cases dealing with dying declarations reflect the doubts that are equally applicable to spontaneous declarations. The largely undefined word “testimonial” provides an opportunity for reexamining what hearsay statements are inadmissible without confrontation. New York’s strong belief in the importance of confrontation, shown lately in the majority and dissenting opinions in People v Johnson (1 NY3d 302 [2003]), justifies a state law interpretation of confrontation that is independent of the federal one. (People v Roman, 212 AD2d 390 [1st Dept 1995], lv denied 86 NY2d 740 [1995]; People v Persico, 157 AD2d 339, 345 [1st Dept 1990], lv denied 76 NY2d 895 [1990] [which found that the state law relating to the admission of coconspirator statements under People v Sanders (56 NY2d 51 [1982]) was more protective then the federal law and chose to comply with Sanders].)
The 911 call in this case was for the purpose of invoking police action and the prosecutorial process. The only use of the statements was for government intervention including judicial proceedings. Under the New York Constitution, the defendant was entitled to confront his accuser.
C. The Second Call
The second call was made on January 29, 2002 at 2:43:41 p.m. Because the witness was available and actually testified, the tape was admissible under Crawford. Further, the tape was admissible under New York law as a present sense impression because it was made in less than a minute after the observation. (People v Buie, 86 NY2d 501 [1995]; People v Robinson, 282 AD2d 75 [1st Dept 2001].) Because it was independently admissible evidence relevant to the case it was not excludable as a prior consistent statement.
The analysis of the statement under New York hearsay law required the redaction of those portions that referred to the declarant’s child and the school. These appeared to be based on prior knowledge and not present sense impressions.

. At one point in the opinion, the Court referred to Mattox v United States (156 US 237 [1895]), noting that the opportunity to confront the witness be “adequate.” (541 US at —, 124 S Ct at 1367.) Adequacy raises the issue of whether the prior cross-examination was reasonably related to the issues raised at trial.

. The rest of the recorded conversation is between the 911 operator and the EMS dispatcher with the caller on the Une for some part of the conversation.

. The volume is in the rare book collection at the library of the Association of the Bar of the City of New York.

. Langbein disputes Wigmore’s conclusion that the development and application of the hearsay rule occurred in the 17th century, arguing, as noted, that it was a later development. (Langbein, The Origins of Adversary Criminal Trial, at 180 [Oxford Univ Press 2003].) This brings the hearsay development into the period of the writing of the Sixth Amendment.

. Originally, prosecutions were private matters undertaken by the victim. (See Origins, generally; Jonakait, The Origins of the Confrontation Clause: An Alternative Theory, 27 Rutgers LJ 77, 97-100 [1995] [hereinafter Jonakait].)

. On January 26, 1787, the Legislature passed an act concerning the rights of the citizens of this state, known as the Bill of Rights. It was continued in 1801 and 1813. The 1787 Act is reprinted in full at 1 Lincoln, Constitutional History of New York State (at 728-732 [1906]). Lincoln finds the origins of *588 many of the listed rights in Magna Carta and the English Bill of Rights of 1689. The confrontation right is not expressly mentioned, but due process of law is a protection against wrongful imprisonment or loss of property.
The confrontation right is not included in the constitutional provisions listing the rights of a person accused of a crime in the New York Constitution of 1821 (art VII, § 7), the New York Constitution of 1846 (art I, § 6), or the New York Constitution of 1894 (art I, § 6 and its amendments). (1 Lincoln, Constitutional History of New York State, at 214, 227-228 [1906]; 4 Lincoln, Constitutional History of New York State, at 68-69 [1906].)

. The court in Coleman v Southwick (9 Johns 45, 50 [Sup Ct, NY County 1812]), wrote that the source of the information is the best evidence. “Hearsay testimony is, from the very nature of it, attended with all such doubts and difficulties, and it cannot clear them up. ‘A person who relates a hearsay, is not obliged to enter into any particulars, to answer any questions, to solve any difficulties, to reconcile any contradictions, to explain any obscurities, to remove any ambiguities: he intrenches himself in the simple assertion that he was told so, and leaves the burden entirely on his dead or absent author.’ It is against sound principle, and would at once awaken distrust, for a party to resort to a secondary species of evidence, so long as the original and primary evidence exists and can be produced.” (Id.)

. See White v Illinois (502 US 346, 365 [1992] [Thomas, J., concurring]); People v Newland (6 AD3d 330 [1st Dept 2004] [adopting the narrow definition of testimonial for a statement different from the one in this case]).

. The use of hearsay to rebut a claim of recent fabrication is an old rule not within the scope of this issue. (Robb v Hackley, 23 Wend 50 [1840].)

. The Court stated in People v Nieves (67 NY2d 125, 135 n 4 [1986]) and People v Edwards (47 NY2d 493, 497 n 1 [1979]) that spontaneous utterances and present sense impressions are synonymous.

. The new technology is itself a basis for reexamining the hearsay exceptions.