Mark J. KEARNEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–04–00096–CR.

Court of Appeals of Texas,
Waco.

Nov. 2, 2005.

Roy E. Greenwood, Jr., Austin, for appellant.

Bill R. Turner, Brazos County Dist. Atty., Bryan, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

Asserting four issues, Appellant Mark Kearney challenges his conviction of attempted capital murder. We will affirm.

### Background

Shirley Schultz, the owner of a Bryan Western Union store, testified that while at the store on the evening of May 13, 2003, she heard gunshots in the store lobby. She saw a masked man, waving a gun and demanding money. Schultz was able to run out the back door, go to a neighboring house, and call 9–1–1 and report the armed robbery in progress.

Dean Swartzlander, a Bryan police officer, testified that he was on duty that evening when he heard a "robbery in prog-

ress" call on his radio. He was two blocks away from the Western Union store and immediately drove there. As he arrived at the store, he noticed a white vehicle driving away. A civilian pointed at the white vehicle and indicated that it was involved in the robbery. Swartzlander pursued it through a residential neighborhood until the vehicle suddenly stopped at an intersection. The driver and a backseat passenger began to get out. As Swartzlander opened his patrol car door, the backseat passenger began shooting at Swartzlander with a handgun, with one shot hitting his patrol car door. Swartzlander dropped to the ground and retreated to the back of his patrol car. From there, he fired two shots at the shooter, who was fleeing on foot.

Walt Melnyk, another Bryan police officer, arrived and joined Swartzlander in the foot pursuit. They found Kearney behind a nearby restaurant; he was lying on the ground and suffering from gunshot wounds. Kearney was arrested and taken to a local hospital, where his gunshot wounds were treated. A short time later, a detective took a recorded statement from Kearney in which he admitted that he was trying to shoot Swartzlander.

Kearney was indicted for the felony offense of attempted capital murder. A jury found him guilty, and the trial court assessed punishment at seventy-five years' imprisonment.

### Issues

Kearney's first issue asserts a Confrontation Clause challenge to the 9–1–1 tape. His other three issues relate to the voluntariness of the recorded confession taken at the hospital. Kearney does not challenge the sufficiency of the evidence.

### 9–1–1 Tape

The dispatcher who took the call identified the tape of the 9–1–1 call, his voice, and Schultz's voice. Schultz identified her voice, the dispatcher's voice, and the voices of the neighbors (Allen and Janet Kennemore), whose house she had fled to and called 9–1–1 from. Schultz reported the ongoing robbery, including that a shot had been fired and two of her employees were still in the store. The Kennemores' mostly inaudible voices can be heard in the background. Mr. Kennemore can be heard in the background saying "he [the alleged robber] fired a shot," and Mrs. Kennemore can be heard saying "they're chasing him ... he ran down that way ... the cops are chasing him ... no, they're chasing him in the car." Schultz then said that she was going back to her office and handed the phone to Mrs. Kennemore, who said that she had just seen the robber driving down the street and then that there was shooting taking place.

■ The tape of the 9–1–1 call was admitted over Kearney's objection that his Sixth Amendment confrontation rights were being violated because the State was not calling the Kennemores as witnesses and their statements were on the 9–1–1 tape. We review de novo the trial court's ruling that the admission of the 9–1–1 tape did not violate Kearney's Confrontation Clause rights. *McClenton v. State*, 167 S.W.3d 86, 93 (Tex.App.-Waco 2005, no pet. h.).

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause's central concern is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact. *Lilly v. Virginia*, 527 U.S. 116, 123–24, 119 S.Ct. 1887, 1894,

144 L.Ed.2d 117 (1999). The United States Supreme Court recently held that "testimonial statements" of witnesses absent from trial are admissible over a Sixth Amendment Confrontation Clause objection only when the declarant is unavailable and only where the defendant has had a prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1368–69, 158 L.Ed.2d 177 (2004).

■ The threshold issue in our *Crawford* analysis is whether the statements were testimonial. *Spencer v. State*, 162 S.W.3d 877, 879 (Tex.App.-Houston [14th Dist.] 2005, pet. filed). The *Crawford* Court did not define "testimonial," but it noted three formulations of "core" testimonial evidence: (1) "*ex parte* in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51–52, 124 S.Ct. at 1364. The Court further explained that the term "testimonial" applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. at 1374.

Whether statements such as those made by the Kennemores in a 9–1–1 call to a dispatcher are testimonial for Confrontation Clause purposes has been addressed by apparently only one Texas court to date. *See Ruth v. State*, 167 S.W.3d 560, 568–70 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.). The court began its analysis by reviewing its most recent precedent to determine whether a statement is testimonial:

(1) Testimonial statements are official and formal in nature.

(2) Interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police.

(3) Spontaneous statements to the police are not testimonial.

(4) Responses to preliminary questions by police at the scene of a crime while police are assessing and securing the scene are not testimonial.

*Id.* at 568–69 (citing *Spencer*, 162 S.W.3d at 881–83). Using these principles, the *Ruth* court determined that statements to the police—whether spontaneous or in response to preliminary questions—when police are called to a crime scene shortly after a crime, are not testimonial because such interactions are not initiated by the police and are not formal or structured. *Id.* at 569 (citing *Spencer*, 162 S.W.3d at 882–83). The court then said:

Though no Texas court has yet addressed this situation, statements made during 911 calls are similar in nature to the situation we addressed in *Spencer*. Such statements are not given in response to structured police questioning or with an eye to [ ] future legal proceedings but are initiated by a victim or witness to obtain police assistance. *See People v. Corella*, 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770, 776 (2004); *People v. Moscat*, 3 Misc.3d 739, 777 N.Y.S.2d 875, 879–80 (Crim.Ct.2004); *State v. Davis*, 154 Wash.2d 291, 111 P.3d 844, 849 (2005). They usually do not bear any of the official, formal qualities of the police interactions the Confrontation Clause was intended to protect against. *See Corella*, 18 Cal.Rptr.3d at 776; *Moscat*, 777 N.Y.S.2d at 879–80; *Davis*, 111 P.3d

at 850–51. Some courts have held that statements made during 911 calls should be analyzed on a case-by-case basis because some statements could be testimonial under certain circumstances. *See People v. West*, 355 Ill.App.3d 28, 291 Ill.Dec. 72, 823 N.E.2d 82, 91 (2005) (holding that 911 calls should be analyzed on a case-by-case basis to determine whether statements at issue were volunteered to obtain police action or the result of interrogation to gather evidence for use in a criminal prosecution); *People v. Mackey*, 5 Misc.3d 709, 785 N.Y.S.2d 870, 872 (Crim.Ct.2004) (noting that "[v]arious courts have begun to adopt a fact-specific analysis of the particular call and the caller's motive for making the call" in conducting *Crawford* analyses); *Davis*, 111 P.3d at 850 ("In most cases, one who calls 911 for emergency help is not 'bearing witness,' whereas calls made to the police simply to report a crime may conceivably be considered testimonial. It is necessary to look at the circumstances of the 911 call in each case to determine whether the declarant knowingly provided the functional equivalent of testimony to a government agent."). *But see People v. Cortes*, 4 Misc.3d 575, 781 N.Y.S.2d 401, 415 (Sup.Ct.2004) (categorically concluding that "[c]alls to 911 to report a crime are testimonial under [*Crawford* ]").

*Id.*

■ We agree with *Ruth* that it is necessary to look at the circumstances of each case to determine whether statements made in a 9–1–1 call are testimonial under *Crawford*. *See id.* In this case, Schultz's 9–1–1 call was to report a robbery in progress and to summon emergency police help. The background statements of the Kennemores and the statements made by Mrs. Kennemore after Schultz handed her the phone were only in furtherance of Schultz's non-testimonial call for help. Because the Kennemores' statements on the 9–1–1 call were not testimonial, Kearney's Sixth Amendment rights were not implicated, and the trial court did not err in overruling his objection on that basis. We overrule Kearney's first issue.

### Voluntariness of Confession

Complaining of the trial court's denial of his motion to suppress his hospital bed confession, Kearney's second and third issues challenge the voluntariness of the confession under the U.S. and Texas constitutions and article 38.22, section 6 of the Texas Code of Criminal Procedure. His fourth issue asserts that the State failed to produce competent medical evidence during the *Jackson v. Denno* hearing on his motion to suppress to show that Kearney was mentally or physically capable of giving a voluntary statement. We will consider the three issues together.

■ An accused must give his confession voluntarily before it can be used against him. *Penry v. State*, 903 S.W.2d 715, 744 (Tex.Crim.App.1995); *Sendejo v. State*, 953 S.W.2d 443, 447–48 (Tex.App.-Waco 1997, pet. ref'd.). Once the accused contests the admission of his statement on the ground of "involuntariness," the due process guarantee and article 38.22, section 6 require the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex.Crim.App.1995) (citing *Jackson v. Denno*, 378 U.S. 368, 380, 84 S.Ct. 1774, 1782–83, 12 L.Ed.2d 908 (1964)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005).

■ When reviewing a suppression hearing ruling, we view the evidence in the light most favorable to the trial court's ruling. *See State v. Terrazas*, 4 S.W.3d

720, 725 (Tex.Crim.App.1999); *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim. App.1996). Voluntariness is determined by looking at the totality of the circumstances. *See Griffin v. State,* 765 S.W.2d 422, 427 (Tex.Crim.App.1989). The trial court is the sole judge of the weight and credibility of the evidence, and the court's findings may not be disturbed on appeal absent a clear abuse of discretion. *Alvarado,* 912 S.W.2d at 211. As such, abuse of discretion is the appropriate standard of review for challenges to the trial court's admission of evidence. *See Angleton v. State,* 971 S.W.2d 65, 67 (Tex.Crim.App. 1998).

▉▉▉▉▉▉ At the hearing, the State must prove voluntariness by a preponderance of the evidence. *Alvarado,* 912 S.W.2d at 211.

> However, the prosecution is not put to this burden unless a defendant presents evidence that raises a voluntariness question. See Article 38.22, Section 6, (not applicable unless "a question is raised as to the voluntariness of a statement"); *Romero v. State,* 800 S.W.2d 539, 544 fn. 7 (Tex.Cr.App.1990) ("voluntariness must be put in issue by facts before it is an issue"); *Dunn v. State,* 721 S.W.2d 325, 336 (Tex.Cr.App.1986); *compare* Article 38.22, Section 7, V.A.C.C.P., (trial court not required to submit voluntariness question to jury unless "issue is raised by the evidence").
> *Terrazas,* 4 S.W.3d at 725. The typical case involves a defendant presenting evidence that the police used unconstitutional methods to obtain a confession and the prosecution controverting that evidence with evidence that the police used constitutional methods. *Id.* at 724–25.
> Substantive constitutional law prohibits the government from using an involuntary confession against an accused with the test for voluntariness being

whether the confession is the product "of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex.Cr. App.1995) (statement is involuntary "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker"). Whether the confession is true or false is irrelevant to a voluntariness determination because it is the methods used to extract an involuntary confession that offend constitutional principles. *See Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 624 fn. 12, 625 fn. 13, 30 L.Ed.2d 618 (1972).

*Id.* at 723–24.

This was not a typical case. At the suppression hearing, Kearney did not testify. Detective Albert Neveu was called by the defense to testify about the hospital bed confession that he had obtained from Kearney late in the evening after the robbery and shootout. Before talking to Kearney, Neveu was aware that he had been shot twice and had been in surgery. Neveu did not know how long Kearney had been out of surgery. Neveu did not ask any physician whether Kearney had been under anesthesia, nor whether Kearney was on any medication. In response to Kearney's counsel's questions about Kearney's physical condition at that time, Neveu said that Kearney "looked like he was in pretty good shape." Neveu had anticipated that Kearney would be "laying there kind of limp but he was pretty livid and active laying down on his back."

After Neveu gave *Miranda* warnings to Kearney, the following pertinent exchange occurred in the taped confession:

NEVEU: Okay, was you trying to hit the officer when you shot at him, or scare him?

KEARNEY: I was trying to hit him.

NEVEU: Okay, so you could get away, correct?

KEARNEY: Yes.

NEVEU: Okay. How did you manage to get out of the car and get on foot? Did you decide to jump out and run or what was the deal there?

KEARNEY: I choose not to answer the question.

NEVEU: Okay, okay. Did the officer tell you to stop?

KEARNEY: I seen him out there; I seen him out there ... (inaudible)

NEVEU: Did you shoot first or did he shoot first? Or can you remember?

KEARNEY: I think I did. I don't, I don't know about that.

NEVEU: Okay.

KEARNEY: But I think I did.

NEVEU: How many times did you shoot?

KEARNEY: I don't know.

The State offered Kearney's medical records into evidence. They reflect that Kearney had three wounds: entry and exit wounds from one bullet and a bullet fragment in his chest "just beneath the skin." The wounds involved only the skin and soft tissues. Without being put under anesthesia, the bullet fragment was removed, and Kearney was given Vicodin for pain. After overnight observation, Kearney was discharged to the county jail the following morning.

On cross-examination by the State, Neveu stated that he did not have any trouble communicating with or understanding Kearney; Kearney's conversation made sense. After reading Kearney the *Mi-randa* warnings, Kearney said that he understood them. He spoke with Neveu "freely and voluntarily." Kearney's choice not to answer a question was an indication to Neveu that Kearney understood that he had the right to refuse to talk with Neveu. Kearney never said that he did not want to talk to Neveu, who said he did not coerce or persuade Kearney to talk or promise him anything.

The trial court denied the motion and later issued findings. The trial court found that although Neveu did not inquire whether Kearney was on medication, Kearney appeared cognizant and alert at the time of the statement and exhibited an ability to comprehend the questions and answered them appropriately. Kearney showed a clear ability to distinguish between questions that he was willing to answer and those he was not willing to answer.

At trial, and without objection, the State introduced the circumstances surrounding Kearney's confession. Officer Melnyk testified that he rode with Kearney in the ambulance to the hospital and was in the ER with Kearney while physicians treated him. Kearney was not put under anesthesia; he was awake when they removed the bullet. Neveu's trial testimony also included the voluntariness of Kearney's confession; he testified that Kearney's statement was freely and voluntarily given and that Kearney understood his questions. On cross-examination, Neveu admitted that he did not know when Kearney had gotten out of surgery and that he had assumed that Kearney was on pain medication.

In closing argument, Kearney's counsel argued voluntariness,[1] focusing on Neveu's taking the statement when Kearney "just

---

1. The voluntariness issue was not submitted to the jury.

got out of surgery" and "had ... some painkillers in him." "He's [Neveu] taken that [statement] from a person who just had two slugs removed from him some 20 minutes before just out of E.R."

■ In a review of a trial court's suppression hearing ruling, we generally consider only the evidence adduced at the suppression hearing. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996).

> However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits. *Id.* [*Hardesty v. State,* 667 S.W.2d 130, 135 n. 6 (Tex.Crim.App. 1984).] Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review. *Id.* at 135; *See also Webb v. State,* 760 S.W.2d 263, 272 n. 13 (Tex.Crim.App. 1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). Moreover, it would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless. TEX.R.APP. P. 81(b)(2).

*Id.*

■ Thus, because Kearney did not object when the State reintroduced the voluntariness issue and participated in the relitigation of the issue in its cross-examinations of Neveu and Melnyk and in closing argument, we may properly consider Neveu's and Melnyk's trial testimony in our review of the trial court's suppression determination. *See id.*

Kearney's argument for his second and third issues is that his confession was involuntary per se because of his *presumably* incapacitated condition after being shot and treated, which he claims raised evidence of involuntariness. He also asserts that the police interrogation was "improper" as a matter of law. Kearney cites no authority that supports his position,[2]

---

2. He does cite the factual scenario in *Jackson v. Denno* as support for the proposition that voluntariness was raised as a matter of law, but a closer analysis of that case belies Kearney's argument. The evidence in *Jackson v. Denno* included a crucial dispute on the issue of police coercion. In that case the defendant Jackson, while being treated for a serious gunshot wound, admitted to a robbery and to shooting a police officer. Jackson claimed that his state court murder conviction was invalid because it was founded on a confession that was not properly determined to be voluntary. The Supreme Court concluded that Jackson was entitled to a state court hearing to determine the voluntariness of his confession, but its conclusion was not based merely on Jackson's medical condition:

> This is not a case where the facts concerning the circumstances surrounding the confession are undisputed and the task is only to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards. Here there are substantial facts in dispute: Jackson said that he was in pain from his wounds, gasping for breath and unable to talk long. A state witness described Jackson as in strong condition despite his wounds. According to Jackson, the police told him he could have no water and would not be left alone until he gave the answers the authorities desired. These verbal threats were denied by the State. Whereas Jackson claimed his will was affected by the drugs administered to him, the State's evidence was that the drugs neither had nor could have had any effect upon him at all. Whether Jackson is entitled to relief depends upon how these facts are resolved, for if the State is to be believed we cannot say that Jackson's confession was involuntary, whereas if Jackson's version of the facts is accepted the confession was involuntary and inadmissible.

*Jackson v. Denno,* 378 U.S. 368, 391–92, 84 S.Ct. 1774, 1789, 12 L.Ed.2d 908 (1964).

and his argument rests entirely on the fact that Neveu did not confer with medical personnel about Kearney's condition before he obtained the confession. Instead, he complains that Neveu's subjective, lay opinion testimony was insufficient to controvert Kearney's presumably incapacitated condition that allegedly raised voluntariness.

■ Kearney additionally asserts that his condition raised reliability questions on his ability to understand his *Miranda* warnings and to waive his constitutional rights.

> An inquiry into the waiver of *Miranda* rights "has two distinct dimensions." First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." ... Intoxication, for example, is but one relevant factor to consider in determining whether an accused understood his rights.

*Ripkowski v. State,* 61 S.W.3d 378, 384 (Tex.Crim.App.2001) (footnotes omitted).

■ Citing *Ford v. State* for the proposition that Neveu's subjective opinion that Kearney's statement was voluntary could not establish that Kearney was capable of understanding the *Miranda* warnings and giving a voluntary confession, Kearney argues that the State was required to present objective medical evidence about Kearney's condition. *Ford v. State,* 158 S.W.3d 488 (Tex.Crim.App.2005). There the court held that in a reasonable-suspicion analysis, mere opinions of an officer are ineffective substitutes for specific, articulable facts, and the record must include objective facts that support the officer's suspicion. *Id.* at 493–94. Kearney cites no other authority that the State was required to present expert medical testimony about his condition at the time of his confession, and we agree with the State that *Jackson v. Denno* does not require it. And while we doubt the applicability of the *Terry*-stop analysis in *Ford* to police-officer testimony in a *Jackson v. Denno* hearing, Neveu's testimony was supported by objective evidence consisting of Kearney's medical records and the taped confession.

■ Kearney's medical records reflect superficial gunshot wounds and an overnight hospital stay. On the taped confession (which we have reviewed), Kearney was able to understand the *Miranda* warnings and Neveu's questions; he even chooses not to answer a question, which is evidence that he not only understood the question, but understood that he had a right not to answer it. Viewing the evidence in the light most favorable to the trial court's ruling, we agree with the State that Kearney did not present evidence that raised a voluntariness question and that voluntariness was not raised as a matter of law. Furthermore, based on the evidence discussed above viewed in the light most favorable to the ruling, the trial court did not abuse its discretion in finding voluntariness by a preponderance of the evidence. We overrule issues two, three, and four.

## Conclusion

Having overruled Kearney's four issues, we affirm the trial court's judgment.