**Keitrick Dowen ARMSTEAD, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–97–440–CR.**

Court of Appeals of Texas,
Fort Worth.

Aug. 20, 1998.

Rehearing Overruled Sept. 24, 1998.

---

Ward Casey, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Chuck Mallin, Asst. Dist. Atty. and Chief of the Appellate Division, John A. Stride, Anne Box, Alan Levy, Asst. Dist. Attys., Fort Worth, for Appellee.

Before CAYCE, C.J., and DAUPHINOT and BRIGHAM, JJ.

## OPINION

CAYCE, Chief Justice.

Keitrick Dowen Armstead was convicted of murder and sentenced to thirteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In three points, appellant contends that the trial court erred in allowing his co-defendant to testify, that his rights to confront witnesses against him were violated when the trial court permitted the co-defendant to testify, and that, in the absence of such testimony, the evidence is insufficient to support his conviction. We will affirm.

Appellant and Dominick Stern, his co-defendant, were members of the 103rd Grape Street Crips gang, and, on November 19, 1993, while wearing their gang colors, drove down Boca Raton Street in Bloods territory.[1] While on Boca Raton Street, appellant and Stern saw three boys walking. One of the boys, Anthony Garrett, was wearing a San Francisco 49er's jacket, similar to the type commonly worn by Bloods members. When appellant drove past the boys, he slowed the car down, almost to a complete stop, while Stern leaned out of the passenger side window of the car and fired eight or nine rounds at the three boys. Garrett received four bullet wounds, one in the chest and three in his legs. He later died from his injuries. The other two boys survived, although one took a bullet in the right buttock and the other in the leg.

A grand jury indicted appellant and Stern for Garrett's murder. Before appellant's trial began, Stern was convicted and sentenced to serve 75 years in prison. While in prison, Stern sent a letter to Investigator Whisenhunt informing him that he had personal knowledge of facts relevant to this case and that he would be willing to testify as a State's witness at appellant's trial. As a result, a few days before trial, Stern met with prosecutors. Satisfied that Stern's testimony would indeed be beneficial to the State's case, the State arranged for Stern to be present and to testify at appellant's trial.

Before Stern testified at trial, the trial court excused the jury and permitted the State and appellant's counsel to conduct a voir dire examination of Stern's testimony. During the voir dire examination, Stern testified that he remembered speaking with the prosecutors earlier in the week but he could not remember what he told them about the events that transpired on November 19, 1993. Stern responded, "I don't remember," when the State asked him if he remembered telling them that: he and appellant were members of the 103rd Grape Street Crips gang; appellant told him, "Don't forget the weapon, don't forget the Tec 9" before they left Stern's apartment that afternoon; he rode in a car with appellant on November 19, 1993; appellant slowed the car down for him; appellant told him, "Man, what's up," meaning to do something or to forget it just before he fired the weapon; he fired a nine-millimeter gun at three individuals on that date; and he was chased and stopped by the police on November 19, 1993. Stern stated, however, that he was not on any medication that would inhibit his ability to recall events, he understood that he was under oath and called as a witness in appellant's trial, and he identified appellant in the courtroom.

Thereafter, defense counsel questioned Stern about the letter[2] he sent to Investiga-

---

1. The Bloods gang is a rival gang of the Crips.

2. Stern wrote in his letter:

I'm writting [sic] in concern of the case set for trial date 4–14–97 [appellant]. Sir we spoke last week about my knowledge of this matter. Well sir I "can" help you in this matter ....

tor Whisenhunt. Stern admitted that at the time he wrote the letter he had personal knowledge of facts relevant to this case; however, he stated that since he wrote the letter something unexplained has happened to his memory. Specifically, Stern explained that no one had threatened him or offered him anything, he just got the "don't remembers."

Immediately after the voir dire examination, appellant's counsel lodged several objections challenging the admissibility of Stern's testimony in front of the jury. Specifically, appellant's counsel argued that Stern's testimony was inadmissible because the voir dire examination revealed that Stern refused to testify and, as a result, it would be improper for the State to ask Stern leading questions under the guise of impeachment. He also objected on the grounds that it would deprive appellant of his right to confront witnesses against him. Finally, appellant's counsel analogized Stern's testimony to that of a co-defendant asserting his Fifth Amendment right. The trial court overruled all of the objections lodged.

In front of the jury, appellant's counsel objected to Stern's testimony alleging the State was attempting to improperly impeach Stern and placing before the jury "matters that are only admissible for impeachment as substantive matters when they know this witness . . . is going to say 'I don't remember' to every question about this case." The court overruled the objection but gave counsel a running objection to every question asked concerning the State's pretrial interview. The State asked Stern:

[STATE:] Do you remember whether or not you told us that you were a member of—or had been a member previously of the Grape Street Crips?

A. I don't remember, sir.

[STATE:] Okay. Do you remember telling us that [appellant] had joined the Grape Street Crips two days after you joined it?

A. No, I don't remember sir.

. . . .

All I'm asking is that you have me bench warranted *as soon as possible*. . . . Sir [i]f pos-

[STATE:] Do you recall on April 13th, 1997, when you met with us . . . telling us that you had driven down Boca Raton on November 19th, 1993, with [appellant]?

A. I don't remember.

[STATE:] Do you recall telling us that you and [appellant] were driving along and saw three guys walking on the side of the road and you both saw some Blood dudes? Do you remember saying that?

A. I don't remember.

[STATE:] Do you remember telling us that [appellant] said "what's up" to you and you said "what's up" back to him, meaning should we do something?

A. No, sir, I don't remember.

[STATE:] Okay. Do you recall telling us that after—as you were driving up Boca Raton, that you pulled your rags up?

A. No, sir, I don't remember.

[STATE:] Do you recall telling us that the gun was in your lap and that you chambered a round?

A. No, sir, I don't remember.

[STATE:] Do you recall telling us that, at that point, [appellant] slowed the car down and you yelled out of the car, "What's up, cuz?"

A. I don't remember.

[STATE:] Do you recall telling us that the people on the side of the road didn't reply and as you were hanging out the window looking backwards, the guys just stood there looking stupid?

A. I don't remember.

[STATE:] Do you recall telling us that [appellant] then told you, "Man, what's up," meaning do something or forget it?

A. I don't remember, sir.

[STATE:] And do you recall telling us that you shot at the three people, aiming at their ankles?

A. I don't remember, sir.

[STATE:] You don't remember any of those comments?

A. No, sir.

sible I would also like to talk with [appellant's] attorney of this matter.

On appeal, appellant contends that the trial court erred in allowing the State to improperly impeach Stern by placing inadmissible hearsay evidence in front of the jury under the guise of impeachment when it asked Stern leading questions on direct examination concerning statements he made during a pretrial interview with prosecutors. Appellant argues that his constitutional rights were violated by the trial court's error because he was not afforded an opportunity to confront the witnesses against him. Additionally, he claims that his substantive rights were violated because, in the absence of the State's questions, appellant contends that there is insufficient evidence [3] in the record showing that he intended to participate in and/or promoted or assisted in the commission of the crime or agreed to commit the crime.

Although the State concedes that Stern's testimony "merely undermined his own credibility while lending nothing significant to the proceedings," the State contends that the trial court acted within its discretion in allowing the State to question Stern because "so far as the State knew prior to trial, Stern was going to testify." Specifically, the State asserts that it was "surprised" by Stern's acute "eleventh hour memory loss," and, as a result, under TEX. R. CRIM. EVID. 607,

610(c) and 612(a),[4] the trial court properly admitted Stern's testimony because he had become either a hostile witness or one identified with an adverse party at trial. *See id.* We disagree.

The determination of the admissibility of evidence is within the sound discretion of the trial court and will not be reversed on appeal unless the trial court clearly abused its discretion. *See Greenwood v. State,* 948 S.W.2d 542, 552 (Tex.App.—Fort Worth 1997, no pet.); *Osby v. State,* 939 S.W.2d 787, 789 (Tex.App.—Fort Worth 1997, pet. ref'd). An abuse of discretion will be found "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex. Crim.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

▆▆▆ In this case, we find that the trial court erred in allowing Stern to testify in front of the jury. When Stern responded "I don't remember" to every substantive question asked on voir dire, the State was put on notice that his trial testimony would likely be the same. It is well-settled that a party may not call a witness primarily for the purpose of impeaching the proposed witness with evidence that would otherwise be inadmissible.

---

**3.** Appellant does not state whether he challenges the legal or factual sufficiency of the evidence. However, because he only cites cases involving a legal sufficiency review, we find that appellant has not properly submitted a factual sufficiency issue for this court's consideration. *See* TEX. R. APP. P. 33.1. As a result, we will conduct only a legal sufficiency review of the evidence.

**4.** The provisions of former TEX. R. CRIM. EVID. 607, 610(c), and 612(a) are carried forward in the new TEX. R. EVID. 607, 611(c), and 613(a), respectively. The rules provide:

**RULE 607. WHO MAY IMPEACH**

The credibility of a witness may be attacked by any party, including the party calling the witness.

TEX. R. EVID. 607.

**RULE 611. MODE AND ORDER OF INTERROGATION AND PRESENTATION**

. . . .

(c) **Leading Questions.** Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the testimony of the witness. Ordinarily leading questions should be permitted on cross-examination. When a party calls a

hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

TEX. R. EVID. 611(c).

**RULE 613. PRIOR STATEMENTS OF WITNESSES: IMPEACHMENT AND SUPPORT**

(a) **Examining Witness Concerning Prior Inconsistent Statement.** In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of, such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted. This provision does not apply to admissions of a party-opponent as defined in Rule 801(e)(2).

TEX. R. EVID. 613(a).

*See Barley v. State,* 906 S.W.2d 27, 37 n. 11 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 217 (1996); *Pruitt v. State,* 770 S.W.2d 909, 910–11 (Tex. App.—Fort Worth 1989, pet. ref'd). We find, therefore, that it was improper for the State to call Stern as a witness knowing that he would feign a memory loss only to introduce facts into evidence by asking leading questions.[5] *See Sills v. State,* 846 S.W.2d 392, 396–97 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd); *Gannaway v. State,* 823 S.W.2d 675, 678 (Tex.App.—Dallas 1991, pet. ref'd).

Having found error in the trial court's ruling, we must now determine whether the error is reversible. *See* TEX. R. APP. P. 44.2. Under appellate rule 44.2(a) and (b), we must determine whether the complained-of error is constitutional. *See id.* If it is, we must apply Rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. *See* TEX. R. APP. P. 44.2(a). Otherwise, we apply Rule 44.2(b) and disregard the error if it does not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Coggeshall v. State,* 961 S.W.2d 639, 642–43 (Tex.App.—Fort Worth 1998, pet. ref'd) (en banc).

■ Although appellant does not address the proper standard of review, his argument implicitly suggests that the error is constitutional. First, he contends that the trial court's error has denied him the right to cross-examine witnesses, as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 10 of the Texas Constitution. Second, appellant contends that if we were to disregard the State's improper questions, there would be legally insufficient evidence to convict him under the law of parties. Appellant concludes under this point that he has a due process right under the Fifth and Fourteenth Amendments to the United States Constitution and to due course of law under article I, section 19 of the Texas Constitution and that those rights were violated when there is insuffi-

cient evidence to support a conviction. Although the admission of otherwise inadmissible hearsay is not constitutional error, *see King v. State,* 953 S.W.2d 266, 271 (Tex.Crim. App.1997) (assuming without deciding that the trial court erroneously admitted hearsay, the court of criminal appeals conducted a harm analysis under Rule 44.2(b)), we will briefly address appellant's constitutional arguments.

Appellant does not specifically identify, either in his brief or in the objection lodged at trial, the witness whom he was denied a right to confront. The State reads appellant's brief so as to assert that he was denied a right to confront Stern. However, we interpret appellant's argument to be that he believes the prosecutor's questions constituted testimony and, as a result, he should have been afforded an opportunity to cross-examine the prosecutor in this case. In either situation, we find that his constitutional rights were not violated.

In addressing whether appellant should have been given an opportunity to cross-examine the prosecutor, we find that appellant has not properly presented this issue for our review because he presents no argument or authority to support this contention. *See* TEX. R. APP. P. 38. 1(h).

■ Regarding Stern, the record in this case shows that Stern testified during the State's case-in-chief and that appellant's counsel fully cross-examined him and admitted, without objection, Stern's written confession and letter to the prosecutors in an attempt to show that Stern was a liar. We find, therefore, that appellant was not denied his right to confrontation. *See Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110 (1974).

Appellant also contends that had the trial court properly excluded the State's questions, the remaining evidence would be legally insufficient to establish that appellant har-

---

5. The State's reliance on *United States v. Payne,* 492 F.2d 449 (4th Cir.1974), *cert. denied,* 419 U.S. 876, 95 S.Ct. 138, 42 L.Ed.2d 115 (1974) is misplaced. In this case, the State did not admit Stern's prior statement as a past recollection recorded. Moreover, the reliability of any statement that Stern gave to the prosecutors had not been sufficiently supported by sworn testimony. *See id.* at 451–55.

bored the requisite intent to commit this crime. We disagree.

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *See Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Emery v. State,* 881 S.W.2d 702, 705 (Tex. Crim.App.1994), *cert. denied,* 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979).

■ Circumstantial evidence may be sufficient to support a finding that one participated as a party in the commission of an offense. *See Beardsley v. State,* 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *Scott v. State,* 946 S.W.2d 166, 168 (Tex.App.—Austin 1997, pet. ref'd). However, standing alone, proof that an accused was present at the scene of the crime or assisted the primary actor in making his getaway is insufficient. *See Scott,* 946 S.W.2d at 168. The evidence must show that at the time of the offense the parties were acting together, each contributing some part towards the execution of their common purpose. *See Brooks v. State,* 580 S.W.2d 825, 831 (Tex.Crim.App. [Panel Op.] 1979). Thus, evidence is sufficient to support a conviction under the law of parties where the actor is physically present at the commission of the offense and encourages the commission of the offense either by words or other agreement. *See Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). Whether an accused participated as a party to an offense may be determined by examining the events occurring before, during, and after the commission of the offense and by the actions of the accused which show an understanding and common design to commit the offense. *See Beier v. State,* 687 S.W.2d 2, 4 (Tex.Crim. App.1985). In determining the legal sufficiency of the evidence to show appellant's intent, and faced with a record that supports conflicting inferences, we "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App. 1991).

■ Contrary to appellant's contention, the record in this case is replete with evidence, properly admitted, to support his conviction as a party to the offense, Marcus DeFaye Cox testified that he was standing outside watching the victims walking down Boca Raton when he noticed a maroon-colored car approach them from behind, travel "fairly close" to them and come "almost to a complete stop." Cox said the car had been "moving along" down Boca Raton, but then it "slowed down. And once the car actually slowed down" then shots began ringing out. When the shooting ended, Cox saw appellant's car "move[ ] out pretty quickly."

Charles Edward Williams, one of the victims of the shooting, testified that as the car passed he saw it slow down with somebody hanging out of the passenger side window holding a gun and saying, "What's up, cuz." When the shooting stopped, Williams saw the car speed away.

Officer C.J. DeOreo testified that he was in the Boca Raton neighborhood when he received a call over the police radio concerning a shooting in the area. He said that he immediately began surveying the area for the suspects. Eventually he located the suspects driving down Boca Raton and began to pursue them. Officer DeOreo testified that when he turned on his patrol lights to initiate a stop the suspects attempted to elude police pursuit. Appellant was driving the car, and eventually stopped, and was arrested immediately. Officer DeOreo said that appellant seemed "pretty calm" about what had just happened.

Appellant testified and admitted that he and Stern were both members of the 103rd Grape Street Crips gang.

Officer Gary Jamiolkowski, a gang intelligence officer, testified that he interviewed appellant at the scene of the crime after he had been arrested. He stated that appellant was wearing a purple T-shirt and khaki Dickie workpants, clothing commonly worn among 103rd Grape Street Crips members. He also noticed that appellant had a Crips tattoo on his left hand. Appellant told Officer Jamiolkowski that he was a member of the 103rd Grape Street Crips gang.

Fort Worth Police Officer Herman T. Young, a gang expert, testified that the 103rd Grape Street Crips is a subgroup of the larger Crips gang headquartered in Los Angeles, California. Gang members in this particular subset generally wear either blue or purple colored clothing, e.g. shirts and shoelaces, to identify themselves as members. The Crips's rival gang is the Bloods, whose primary color is red, and are known to wear San Francisco 49er's clothing to identify themselves as "Bloods." Further, Officer Young testified that, when Crips see Bloods members wearing 49er's clothing, they react violently towards the Bloods members. Crips yell "what's up, cuz" to Bloods when they are getting ready to kill the Bloods member. By yelling "what's up, cuz" the Crips member is identifying himself to the Bloods member and hopes to see the expression on the Bloods's face before he kills him. Officer Young stated that the highest priority among gang members is respect and gang members attain respect by killing others in the name of their gang.

Considering the actions of appellant before, during, and after the shooting in the light most favorable to the jury's verdict, we find that a rational trier of fact could have found beyond a reasonable doubt that appellant encouraged the commission of the crime either by his words or other agreement based on properly admitted evidence. *See Burdine*, 719 S.W.2d at 315. We find, therefore, that the evidence was legally sufficient to support appellant's conviction.

Finally, because the admission of otherwise inadmissible hearsay is a noncon-stitutional error, we must conduct a harm analysis under Rule 44.2(b) and disregard the error unless it affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *King*, 953 S.W.2d at 271. A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *See King*, 953 S.W.2d at 271.

We have reviewed and outlined the evidence in our legal sufficiency discussion above. Given the amount of evidence establishing appellant's guilt—aside, of course, from that erroneously admitted—we hold that the testimony did not have a substantial influence or injurious effect on the jury's verdict. Therefore, we find the error harmless.

Accordingly, we affirm the judgment of the trial court.