Affirmed and Opinion filed June 21, 2005









Affirmed and Opinion filed June 21, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-01158-CR

____________

 

JOSEPH PERNELL
RUTH,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 208th
District Court

Harris County, Texas

Trial Court Cause No. 914,967

 



 

O P I N I O N

Appellant, Joseph Pernell Ruth, appeals
his conviction for the murder of Kenjenea Williams. In seven issues, appellant
makes the following claims: the trial court erred in permitting his daughter to
be cross-examined with a prior written statement, admission of his wife’s
hearsay statements violated his right of confrontation, the trial court erred
in admitting appellant’s statements to the police, and the evidence is
factually insufficient to support the verdict. 
We affirm.








                          Factual
and Procedural Background

Appellant is married to Clara Ruth, and
they have four children together. 
Several years after they were married, appellant began a romantic
relationship with the victim, Kenjenea Williams.  Appellant and Williams eventually had two
children together, and both of these children are the same ages as two of his
children with Clara.  Appellant and Clara
lived in a house on Greencraig Street in Houston, Texas, and appellant rented a
nearby apartment for Williams.  Sometimes
appellant lived on Greencraig with Clara, and sometimes he stayed with
Williams. At times, Williams’s children lived with appellant and Clara on
Greencraig, and at other times, they lived with Williams in her apartment.  Angelica Ruth, appellant and Clara’s oldest
daughter, considered Williams’s children to be her brother and sister.

The living arrangements and relationship
between appellant and these two women were complex and volatile.  After Clara learned of the appellant’s
relationship with Williams, Clara, with appellant’s help, tried to physically
evict Williams from her apartment.  At
one point, appellant obtained a restraining order against Williams, which he
then ignored to continue his relationship with her. 

In early June 2002, Williams was arrested
for cocaine possession, and appellant loaned her money to get out of jail.  Appellant was very concerned that Williams
repay this money, and he told Williams’s cousin, “I promise you, man, if your
cousin don’t pay me back this money, y’all going to be missing a family
member.”  On June 12, 2002 around 6:30
p.m., while Williams was at a car repair shop, appellant came up behind
Williams and grabbed her and said, “Where’s my $4,000 b---- (expletive).”  The car repair shop owner testified that
appellant seemed very angry and that Williams seemed scared and appeared to be
trying to calm appellant.  After he found
out that she had paid for her car repair, appellant grabbed Williams’s hand and
said, “Let’s go.”  Williams was killed
shortly thereafter.








According to a written statement by
Angelica, who was nine years old at the time, she and her mother and siblings
were at their home on Greencraig when appellant and Williams arrived.  She heard appellant and Williams arguing and
then saw Williams on her knees and appellant standing over Williams with a gun
in his hand.  Angelica heard Williams
say, “Please, no, Joe.”  Appellant then
said “You going to take care of the kids?,” and Williams responded “Yes, I
will.”  While Clara was gathering the
children to take them out of the house, Angelica saw appellant and Williams,
still arguing, go into the back yard.  Clara,
Angelica, and the rest of the children left. 
Angelica told the police she did not hear or see the shooting.

Clara and the children went to a house
where several of Clara’s relatives lived, including her cousin and mother.  According to Clara’s cousin, who testified at
trial, Clara showed up scared, crying, and hyperventilating and asked to speak
to her mother.  When Clara’s mother came
outside, Clara said to her, “Joseph shot Kenjenea.”  Clara explained that appellant and Williams
had been arguing and that she saw appellant shoot Williams nine times in the
head and many more times in the body. 
Clara’s mother called 911 for her, and Clara told the 911 operator, “I
left my house and my husband’s girlfriend whatever was in the house and . . .
they started arguing.  He pulled out a
gun so I left. . . . I don’t know what’s going to happen. . . . They’re
arguing.  He has a gun. . . .  They always have arguments.”  








Police responded and arrived at the house
on Greencraig at about 7:26 p.m.  They
found Williams dead in the back yard with a total of fifteen gunshot wounds,
nine of which were in the head and face. 
Soon, relatives of both appellant and Williams began to gather at the
scene.  Around 10:30 that evening,
appellant approached a parked Houston Police Department patrol car and told the
officer, Joel Garza, “Officer, I’m wanted. 
I just killed my wife, the mother of my kids.  Please take me in.”  Officer Garza was at the end of his shift
completing paperwork so he could go home, and he really did not want to deal
with appellant.  He asked appellant,
“What?,” and appellant stated, “Please, officer, hurry up.  They’re coming.  Her relatives are coming to kill me.  Please, hurry up, take me in.”  Officer Garza, who knew nothing about the
murder, thought he was dealing with a “nut case,” so he planned on dropping
appellant off at the main police station. 
Garza opened the back of his police car, and appellant got inside.  According to Garza, during the drive, appellant
was very talkative and told him that he killed the mother of his children
because he had taken money out of savings to post bail for her and “he had it”
with her.  Appellant also told Officer
Garza that he had gotten a protective order against her and that he was “tired
of her stupid mess.”  Officer Garza
called homicide and learned of the murder. He then took appellant to the
homicide division.  Appellant denied that
he told Officer Garza that he murdered anyone and claims that he wanted to be
taken into custody solely for protection from Williams’s relatives. 

At trial, the jury found appellant guilty
of murder, and appellant was sentenced to ninety-nine years in prison.  This appeal followed.

                                                      Analysis

                                        Angelica’s
Written Statement

On the night of the murder, Angelica
accompanied an officer to the police station and made a statement, which the
officer typed.  Angelica’s written
statement provides in relevant part as follows:

Tonight I was at home doing the
dishes when there was a knock at the door. 
My mom answered it.  My dad and
[Williams] were there.  They both came
inside.

I heard my dad and [Williams] begin
to argue.  They were in the hallway.  I was still in the kitchen.  My mom was at the doorway to the master
bedroom.  She called for me to come to
her.  As I walked past my dad and
[Williams] I saw that [Williams] was on her knees and my dad was standing over
her with a gun in his hand.  I heard
[Williams] say, “Please, no, Joe.”  I
then heard my dad say, “You going to take care of the kids?”  [Williams] said, “Yes, I will.”

I went into the master
bedroom.  My mom went to gather the rest
of the kids in the house.  I peaked out
the master bedroom window and saw that my dad and [Williams] had gone into the
back yard.  They were still arguing.

My mom came and got me.  She, my three sisters, my brother and I all
got in the van parked out front.  Mom
drove us away.  I did not hear or see any
shooting.








Based on the information in her statement,
the State called Angelica as a witness during the guilt stage of the
trial.  Before she could testify,
however, appellant’s counsel requested a hearing, claiming Angelica was
incompetent to testify and had no relevant testimony to give because she would
testify that she could not remember the events on the night of the murder or
giving a statement to the police.  The
prosecutor explained that Angelica and Clara had gotten their own attorney and
since that attorney had prevented the prosecutor from speaking to Angelica, she
did not know what Angelica’s testimony would be.  After the competency hearing, the trial court
determined Angelica was competent to testify.

In the presence of the jury, Angelica
testified about her family structure, including describing all of appellant’s
children with Clara and Williams and explaining where the children lived and
who cared for them.  Angelica said she
knew that Williams was killed and thought it happened at the house on
Greencraig, but she said she did not remember anything else about that
evening.  She examined the written
statement and acknowledged that it was her signature on the statement, but she
claimed she could not remember going to the police station or making the
statement.

When the prosecutor attempted to impeach
Angelica with her statement to the police, appellant made several objections,
including hearsay and improper impeachment. 
His principal objection, both in the trial court and on appeal, is that
the State could not call Angelica solely for the purpose of impeaching her with
otherwise inadmissible evidence.  The
prosecutor responded that she called Angelica in good faith based on her
written statement, that she was surprised by Angelica’s memory failure, and
that Angelica’s testimony was needed to establish other important facts, such
as the structure and operation of her family. 
The trial court overruled appellant’s objection, finding that Angelica
was not being called solely for impeachment purposes, and gave a limiting
instruction that the jury should consider the statement for impeachment purposes
only.  In his first two issues, appellant
complains that the trial court erred in admitting Angelica’s written statement
to the police for impeachment purposes.








We review a trial court’s decision to
admit or exclude evidence under an abuse of discretion standard.  Long v. State, 130 S.W.3d 419, 426
(Tex. App.—Houston [14th Dist.] 2004, no pet.). 
We must uphold the trial court’s decision as long as it is within the
zone of reasonable disagreement, giving almost total deference to a trial
court’s determination of historical facts that are supported by the
record.  Wheeler v. State, 67
S.W.3d 879, 888 (Tex. Crim. App. 2002); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).

Texas Rule of Evidence 613(a), which
concerns examining witnesses regarding a prior inconsistent statement, provides
in relevant part:

In examining a
witness concerning a prior inconsistent statement made by the witness, whether
oral or written, and before further cross-examination concerning, or extrinsic
evidence of, such statement may be allowed, the witness must be told the
contents of such statement and the time and place and the person to whom it was
made, and must be afforded an opportunity to explain or deny such statement. .
. . If the witness unequivocally admits having made such statement,
extrinsic evidence of same shall not be admitted.   

Tex. R. Evid. 613(a) (emphasis
added).  If the admission is partial,
qualified, or otherwise equivocal, or if the witness claims to not remember
making the prior statement, the prior statement is admissible for impeachment
purposes.  See McGary v. State,
750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988); Staley v. State,
888 S.W.2d 45, 49–50 (Tex. App.—Tyler 1994, no pet.); Miller v. State,
666 S.W.2d 269, 274 (Tex. App.—Dallas 1984, pet. ref’d).  Here, when questioned about the statement,
Angelica did not unequivocally admit making it; rather, she claimed she could
not remember. 








Although Angelica’s statement was
admissible for impeachment purposes, appellant is correct that the State cannot
call a witness for the primary purpose of impeachment and thus use impeachment
as a subterfuge to present otherwise inadmissible evidence.  See Barley v. State, 906 S.W.2d 27, 37
n.11 (Tex. Crim. App. 1995); Armstead v. State, 977 S.W.2d 791,
795–96  (Tex. App.—Fort Worth 1988, pet.
ref’d).  However, the State must know in
advance that the witness will recant.  See
Barley, 906 S.W.2d at 37 n.11 (summarizing prior cases on the issue, noting
that “in each of those cases, the witness had already recanted his or
her statement in prior sworn testimony at a previous trial or hearing”); Kelly
v. State, 60 S.W.3d 299, 302 (Tex. App.—Dallas 2001, no pet.) (finding no
abuse of discretion in allowing State to impeach with prior statement when
prosecutor suspected, but did not know for certain, that witness would
recant).  The prosecutor had not been
able to speak with Angelica before calling her and had a good faith belief that
Angelica would testify according to the statement she gave to the police.  Though appellant’s counsel told the court he
suspected she did not recall giving the statement, the State is not required to
accept defense counsel’s representation at face value.[1]  Further, the trial court explicitly found
that Angelica was not being called solely for impeachment purposes, and that
finding is supported by the record. 
Thus, the trial court did not abuse its discretion in admitting the
statement.

Even if the trial court erred in admitting
Angelica’s statement, any such error is harmless in this case.  The most damaging portion of Angelica’s
statement—that appellant was standing over Williams with a gun in his hand—was
also admitted after appellant opened the door during his case-in-chief,[2]
and appellant does not complain on appeal about the admission of that
testimony.  “[O]verruling an objection to
evidence will not result in reversal when other such evidence was received without
objection, either before or after the complained-of ruling.”  Leday v. State, 983 S.W.2d 713, 718
(Tex. Crim. App. 1998).

We overrule appellant’s first and second
issues.








                                         Clara’s
Hearsay Statements

As detailed above,
when Clara arrived at her cousin’s house, Clara told her mother that appellant
and Williams had been arguing and that appellant had shot Williams multiple
times in the head and body.  Appellant
objected to Clara’s cousin’s testimony regarding Clara’s statements based on
hearsay.  The trial court overruled
appellant’s objection, concluding the statements were excited utterances under
Texas Rule of Evidence 803(2), and appellant does not dispute on appeal that
these statements were excited utterances. 
Clara’s cousin then authenticated the tape of the 911 call, on which
Clara tells the 911 operator that appellant and Williams were arguing and that
appellant had a gun. Appellant objected to admission of the 911 tape on
multiple grounds, including hearsay and violation of his right to confront
witnesses under the state and federal constitutions.[3]  The trial court overruled these objections as
well and admitted the 911 tape.








In his third and fourth issues, appellant
complains that the trial court’s admission of Clara’s hearsay statements
violated his right of confrontation.[4]  At trial, however, appellant objected to
Clara’s statements to her mother only on the basis of hearsay. It is well
established that a hearsay objection does not preserve a Confrontation Clause
argument for appeal.[5]  See Wright v. State, 28 S.W.3d 526,
536 (Tex. Crim. App. 2000); Saldivar v. State, 980 S.W.2d 475, 496 (Tex.
App.—Houston [14th Dist.] 1998, pet. ref’d). 
Thus, as to Clara’s statements to her mother implicating appellant, any
Confrontation Clause complaint is waived.[6]
Accordingly, we address only whether the admission of the 911 tape violated
appellant’s constitutional right to confront witnesses. 

In Crawford v. Washington, 541 U.S.
36 (2004), the Supreme Court established a new framework for analyzing
Confrontation Clause claims.  If the
statement at issue is “testimonial,” it is inadmissible unless the declarant is
unavailable and the accused has had a prior opportunity for
cross-examination.  Id. at
53–54.  Thus, the threshold issue under Crawford
is whether the statement to be admitted is testimonial.  Spencer v. State, __ S.W.3d __, No.
14-04-00059-CR, 2005 WL 975672, at *2 (Tex. App.—Houston [14th Dist.] Apr. 28,
2005, no pet. h.).  The Crawford
Court did not define “testimonial,” but it noted three formulations of “core”
testimonial evidence:  (1) “ex parte
in-court testimony or its functional equivalent,” such as affidavits, custodial
examinations, prior testimony not subject to cross-examination, or “similar
pretrial statements that declarants would reasonably expect to be used
prosecutorially,” (2) “extrajudicial statements” of the same nature “contained
in formalized testimonial materials,” and (3) “statements that were made under
circumstances which would lead an objective witness reasonably to believe that
the statement would be available for use at a later trial.”  541 U.S. at 51–52.  The Court further explained that the term
“testimonial” applies “at a minimum to prior testimony at a preliminary
hearing, before a grand jury, or at a former trial; and to police
interrogations.”  Id. at 68.








In Spencer, we reviewed the
relevant authority from Texas and other jurisdictions in deriving several
principles for use in determining whether a statement is testimonial:

(1)     Testimonial statements are official and
formal in nature. 

(2)     Interaction with the police initiated by a
witness or the victim is less likely to result in testimonial statements than
if initiated by the police.

(3)     Spontaneous statements to the police are
not testimonial.

(4)     Responses
to preliminary questions by police at the scene of a crime while police are
assessing and securing the scene are not testimonial.   

Spencer, 2005 WL 975672, at *4–5.  Using these principles, we determined that
statements to the police, whether spontaneous or in response to preliminary
questions, when police are called to a crime scene shortly after a crime are
not testimonial because such interactions are not initiated by the police and
are not formal or structured.  Id.
at *5.








Though no Texas court has yet addressed
this situation, statements made during 911 calls are similar in nature to the
situation we addressed in Spencer. 
Such statements are not given in response to structured police
questioning or with an eye to a future legal proceedings but are initiated by a
victim or witness to obtain police assistance. 
See People v. Corella, 18 Cal. Rptr. 3d 770, 776 (Ct. App.
2004); People v. Moscat, 777 N.Y.S.2d 875, 879–80 (Crim. Ct. 2004); State
v. Davis, 111 P.3d 844, 849 (Wash. 2005). 
They usually do not bear any of the official, formal qualities of the
police interactions the Confrontation Clause was intended to protect against.  See Corella, 18 Cal. Rptr. 3d at 776; Moscat,
777 N.Y.S.2d at 879–80; Davis, 111 P.3d at 850–51.  Some courts have held that statements made
during 911 calls should be analyzed on a case-by-case basis because some
statements could be testimonial under certain circumstances.  See People v. West, 823 N.E.2d 82, 91
(Ill. App. Ct. 2005) (holding that 911 calls should be analyzed on a
case-by-case basis to determine whether statements at issue were volunteered to
obtain police action or the result of interrogation to gather evidence for use
in a criminal prosecution); People v. Mackey, 785 N.Y.S.2d 870, 872
(Crim. Ct. 2004) (noting that “[v]arious courts have begun to adopt a
fact-specific analysis of the particular call and the caller’s motive for making
the call” in conducting Crawford analyses); Davis, 111 P.3d at
850 (“In most cases, one who calls 911 for emergency help is not ‘bearing
witness,’ whereas calls made to the police simply to report a crime may
conceivably be considered testimonial. 
It is necessary to look at the circumstances of the 911 call in each
case to determine whether the declarant knowingly provided the functional
equivalent of testimony to a government agent.”).  But see People v. Cortes, 781 N.Y.S.2d
401, 415 (Sup. Ct. 2004) (categorically concluding that “[c]alls to 911 to
report a crime are testimonial under [Crawford]”).

We agree with those courts that have
determined that it is necessary to look at the circumstances of each case to
determine whether statements made in a 911 call are testimonial in nature.
Here, however, appellant provides no analysis as to why Clara’s statements to
the 911 operator were testimonial, and we see nothing in the record suggesting
that this call, in which a witness to a crime in progress at her home summoned
the police, deviates from the typical, nontestimonial 911 call.  We hold that Clara’s statements to the 911
operator were not testimonial, and therefore the trial court’s admission of
testimony regarding these statements did not violate appellant’s confrontation
rights.








In any event, error, if any, in the
admission of the 911 tape, is harmless. 
Constitutional error is not reversible if we determine beyond a
reasonable doubt that the error did not contribute to the conviction.  Tex. R.
App. P. 44.2(a); see also Simpson v. State, 119 S.W.3d 262,
269–71 (Tex. Crim. App. 2003) (applying Rule 44.2(a) standard to a
Confrontation Clause claim), cert. denied, 124 S. Ct. 2837 (2004).  Clara’s statements to her mother that
appellant shot Williams multiple times in the head and body are very specific
and much more incriminating than the statements to the 911 operator that
appellant and Williams were arguing and that he had a gun.  In light of this evidence as well as the
other evidence in the record, including appellant’s own statements to the
police, we conclude beyond a reasonable doubt that admission of the 911 tape
did not contribute to appellant’s conviction. 
See Simpson, 119 S.W.3d at 271 (finding Confrontation Clause
violation to be harmless error where evidence of guilt was strong and
erroneously admitted statement was corroborated by other evidence).

We overrule appellant’s third and fourth
issues.

                                   Appellant’s
Statements to the Police

In issues five and
six, appellant claims the trial court erred in denying his motion to suppress
his oral statements to Officer Garza that he killed Williams. At the
suppression hearing, Officer Garza testified that appellant approached him
while Officer Garza was in his patrol car and said that he had just “killed my
wife, the mother of my kids” and asked to be taken in.  Officer Garza asked “What?,” and appellant
again asked to be taken in.  After
appellant was in the back of Officer Garza’s patrol car, he continued to repeat
his prior statements and gave more detail, such as that he had just posted bail
for the woman he killed and that he had “had it” with her.  Officer Garza testified that during this
time, the only questions he asked appellant were for his name and date of
birth.

We review a trial court’s ruling on a
motion to suppress for an abuse of discretion. 
Mason v. State, 116 S.W.3d 248, 256 (Tex. App.—Houston [14th
Dist.] 2003, pet. ref’d).  We give almost
total deference to a trial court’s findings of historical fact when those
findings are supported by the record.  Guzman,
955 S.W.2d at 89.  When, as here, there
are no written findings in the record, we view the evidence in the light most
favorable to the trial court’s ruling and uphold the ruling on any theory of
law applicable to the case.  Mason,
116 S.W.3d at 256.

The Fifth Amendment to the United States
Constitution protects against custodial interrogation by the police without
proper procedural safeguards.  See
Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980); Miranda v. Arizona,
384 U.S. 436, 444 (1966).  Similarly,
Article 38.22 of the Texas Code of Criminal Procedure makes any statement made
as a result of custodial interrogation inadmissible unless certain procedural
steps are followed.  Tex. Code Crim. Proc. Ann. art. 38.22,
§ 3(a) (Vernon 2005). 








We need not determine whether appellant
was in fact in custody when making his various statements to Officer Garza
because we conclude that Officer Garza did not interrogate appellant.  Under both the Fifth Amendment and Article
38.22, voluntary statements not made in response to police interrogation are
admissible.  See Miranda, 384 U.S.
at 478 (“Volunteered statements of any kind are not barred by the Fifth
Amendment . . . .”); Stevens v. State, 671 S.W.2d 517, 520
(Tex. Crim. App. 1984) (finding appellant’s statements to be admissible under
Article 38.22 because “the statements were voluntary statements, made while in
custody but not in response to interrogation”). 
Appellant’s initial statement upon approaching Officer Garza that he
“killed my wife, the mother of my kids” and requesting to be taken in was
completely spontaneous and therefore not the product of interrogation.  Likewise, when Officer Garza said “What?” and
appellant repeated a portion of his prior voluntary statement, that was also
not the product of interrogation. 
Further, general and routine questions do not constitute
interrogation.  Daniels v. State,
25 S.W.3d 893, 897 (Tex. App.—Houston [14th Dist.] 2000, no pet.).  After appellant was in Officer Garza’s patrol
car, Officer Garza merely asked for appellant’s name and date of birth.  Such routine questions are not
interrogation.  Jones v. State,
795 S.W.2d 171, 173, 176 (Tex. Crim. App. 1990) (questions by officer
conducting a field sobriety test, including asking name and date of birth, were
not interrogation); Townsend v. State, 813 S.W.2d 181, 186 (Tex.
App.—Houston [14th Dist.] 1991, pet. ref’d) (“Inquiries by the custodial
officer regarding a defendant’s name, address, height, weight, place of
employment, or physical disabilities are the type of questions normally
attendant to arrest and custody and do not constitute interrogation under the
fifth amendment.”).  We conclude that
appellant’s statements were not the product of interrogation, and thus, the
trial court did not abuse its discretion in denying appellant’s motion to
suppress.  We overrule appellant’s fifth
and sixth issues.

                                          Sufficiency
of the Evidence








In his seventh issue, appellant contends
the evidence is factually insufficient to support his conviction because,
without considering all of the evidence he challenges in his first six issues,
the remaining evidence is “obviously so weak as to undermine confidence in the
jury’s determination and is greatly outweighed by the contrary proof.”  However, in conducting a factual sufficiency
review, we consider all evidence admitted, even if later determined to be
inadmissible.  See Rodriguez v. State,
819 S.W.2d 871, 872–73 (Tex. Crim. App. 1991); Pine v. State, 889 S.W.2d
625, 630 n.3 (Tex. App.—Houston [14th Dist.] 1994, pet. ref’d).  Further, we have concluded that the trial
court did not abuse its discretion in admitting all of the challenged evidence.  That evidence is more than sufficient to
support the jury’s verdict.  We overrule
appellant’s seventh issue.

Having overruled all of appellant’s
issues, we affirm the trial court’s judgment.

 

 

/s/      Leslie Brock Yates

Justice

 

 

 

 

Judgment
rendered and Opinion filed June 21, 2005.

Panel
consists of Justices Yates, Edelman, and Guzman.

Publish
— Tex. R. App. P. 47.2(b).











[1]  Appellant
complains that the State did not voir dire Angelica to verify his
representation.  Appellant cites no
authority that the State is required to voir dire its own witness, and
appellant does not argue on appeal that he was denied any opportunity to
conduct his own voir dire examination.





[2]  During his
case-in-chief, appellant called a detective to the stand and asked him, “Did
Clara Ruth ever say in her statement that she saw Kenjenea Williams kneeling at
Joseph Ruth’s feet while he held a gun on her?,” to which the detective
answered in the negative.  The State
claimed that appellant had opened the door to Angelica’s statement because he
implied Clara had made an assertion that was contained only in Angelica’s
statement.  The detective was then
allowed to clarify that Angelica, not Clara, was the person who had made the
assertion.





[3]  See U.S. Const. amend. VI; Tex. Const. art. 1, § 10.  Where, as here, the parties have not argued
that differences in state and federal constitutional guarantees are material to
the case, and none is apparent, we limit our analysis to the United States
Constitution and assume that its concerns are congruent with those of the Texas
Constitution.  In re Commitment of
Fisher, __ S.W.3d __, No. 04-0112, 2005 WL 1185511, at *6 (Tex. Crim. App.
May 20, 2005).





[4]  Appellant is
unclear in his briefing whether he is also complaining about the statements
Clara made to her mother or only the 911 call, but we will liberally construe
his argument to include both sets of statements.





[5]  Over twenty
pages in the record later, when discussing his objections to the 911 tape,
appellant’s counsel attempted to clarify his objection to the prior testimony
regarding Clara’s statements to her mother, stating:  “I hope the Court appreciates that when I
stand up and say hearsay in the heat of a series of questions, I’m also
complaining about my confrontation rights. 
And I didn’t expressly state that when I made my objection, but I think
in light of all the discussion we’re having about Clara’s and Angelica’s
statements, that was apparent.” 
Appellant does not contend on appeal that this retroactive clarification
preserved a confrontation objection to this testimony, and correctly so.  Confrontation and hearsay are distinct
objections, and an objection made after evidence has been admitted does not
preserve error.  See Atl. Richfield
Co. v. Misty Prods., Inc., 820 S.W.2d 414, 421 (Tex. App.—Houston [14th
Dist.] 1991, writ denied) (noting that “[t]he party waives any complaint if an
objection is made after admission of the evidence” and finding appellant waived
hearsay objection when he failed to include a hearsay objection with his other
objections until the third time the evidence was admitted).





[6]  Even if a
confrontation complaint regarding Clara’s statements to her mother had been
preserved, it is without merit because spontaneous statements to acquaintances
do not implicate the right to confrontation. 
See Woods v. State, 152 S.W.3d 105, 114 (Tex. Crim. App. 2004)
(finding “casual remarks that [the defendant] spontaneously made to acquaintances”
to be nontestimonial), cert. denied, 125 S. Ct. 2295 (2005).