COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOSE PULIDO, | § | No. 08-06-00229-CR |
| Appellant, | § | Appeal from the |
| v. | § | 243rd District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20040D04329) |
| | § | |

**O P I N I O N**

Appellant has appealed from a conviction for the offense of murder of his wife, Florencia ("Flor") Pulido. Appellant pled guilty to the jury, and the jury assessed punishment at thirty-five years' imprisonment and a fine of $10,000. We affirm the judgment of the trial court.

**I.  SUMMARY OF THE EVIDENCE**

Shortly after midnight on the morning of June 22, 2004, El Paso Police Officer David Medina responded to a 9-1-1 hang-up call from Appellant's house. Officers knocked on the door, but no one responded. Medina went around to the back of the house and saw other officers speaking with a female, Jo Ann Flores, in the rear of the house. Officers informed Flores of the 9-1-1 hang-up call. After seeing no signs of struggle in the house, and, after attempting to make contact with the residents without any success, the officers left.

Flores rented the back portion of Appellant's house. She was asleep when police woke her by banging on the windows. After having a conversation with the police, and after the police left, Flores found the spare key to Appellant's house and entered, to make sure everything was all right.

Upon entering Appellant's house, Flores called out for both Appellant and the victim and received no answer. She made her way through the house to the bedroom. Flores called out again with no response, but she could see the victim lying on the bed. Flores reached out to wake the victim and noticed that the victim was very cold. She touched her again and felt a cord wrapped around the victim's neck. Flores opened her cell phone, and Appellant instructed her not to call the police. Flores testified she had been able to see Appellant the entire time she was in the bedroom, but could not tell whether he was asleep or awake. Flores tried to call 9-1-1, but neglected to press "Send" on her phone. Flores asked Appellant "why" she should not call the police, and Appellant responded, "Everything is over." Flores ran out of the bedroom to the outside of the house and called 9-1-1.

Officer Medina and his partner returned to Appellant's house after a second 9-1-1 call. Officer Medina saw Appellant sitting at a table inside the house with a knife near him. He testified that Appellant was not very responsive, possibly unconscious. They observed packages of a drug called Clonazepam[1] near Appellant. Upon moving through the house, Officer Medina's partner found the victim in the bedroom, with an electrical cord around her neck.

Hector Sias and his partner, both El Paso paramedics, arrived at Appellant's house in response to a possible suicide call. They looked over the victim and determined that she was dead. Sias then went to look at Appellant, because someone mentioned that Appellant had ingested some medicine. Sias spoke with the Appellant, who told him that he had killed his wife. Sias's partner overheard Appellant's comment. Sias testified that Appellant was conscious, and Appellant was transported to Thomason Hospital.

---

[1] Dr. Corinne Stern, who was then the El Paso County Medical Examiner, described Clonazepam as a very safe sleeping pill, similar to Valium.

Dr. Stern testified she arrived at Appellant's house in the early morning hours of June 22. Dr. Stern determined that the victim had been choked to death by an electrical cord. She further testified that Appellant's toxicology report was negative for all drugs, indicating that Appellant had not swallowed enough Clonazepam to meet the minimum cutoff of the screening for that particular class of drugs.

El Paso Police Detective Arturo Ruiz, Jr., testified that he was assigned as the case agent in the case. When he arrived at the crime scene, Detective Ruiz was briefed by the patrol officers, and he began organizing the crime scene. He observed various objects on the kitchen table, which included a green notebook with writing and a knife. On June 25, he was present when Appellant gave his confession. Detective Ruiz testified that Appellant was advised of his rights, that he was not in handcuffs, under duress, or otherwise coerced into admitting that he killed his wife. Appellant was given a soda and some chips, and he would have been allowed to use the restroom, if he had so requested.

Court interpreter Margarita Armijo testified at trial that she translated a note left by Appellant on the kitchen table in his house. She had translated the note from Spanish into English. In this note, Appellant asked his children for forgiveness, "for what I am going to do." He left certain items to his children and added that he "was happy with Flor until certain things came up." He said, "Blame no one for my death. It was voluntary."

Detective Joe Ochoa of the El Paso Police Department investigated the victim's murder. Detective Ochoa did not make contact with Appellant until June 25, because Appellant was under a doctor's care at Thomason Hospital. Detective Ochoa testified that, when the main suspect in a homicide is under hospital care, the normal procedure is to have an officer posted at the hospital for security reasons. Officers will not speak with the suspect until he is released from the hospital.

After being released from the hospital, Appellant was taken to the detectives' office. Detective Ochoa testified that Appellant received a *Miranda*[2] warning card and that he and his partner had a conversation with the Appellant which was subsequently put into writing. Detective Ochoa testified that Appellant received his *Miranda* warnings twice and that Appellant freely and voluntarily waived his rights. Appellant never requested an attorney, and the detective testified that he did not coerce Appellant in order to obtain the confession. Detective Ochoa also stated that, after the statement was printed, Appellant had a chance to correct, change, or add anything he wished and that Appellant corrected some of Detective Ochoa's spelling mistakes.

At trial, the State introduced Appellant's written statement and the *Miranda* warning card with Appellant's initials on it as evidence. Appellant objected, contesting the voluntariness and accuracy of the statement. The judge overruled the objection and admitted the statement into evidence.

Appellant's written confession states that his problem with his wife had started on Father's Day, June 20. The victim informed Appellant that she would be going to visit her ex-husband in the hospital. He told her that she could go, but only for a while. The confession further stated that, on June 21, the victim's grandchildren had taken her to the hospital to visit her ex-husband and that they were gone for a long time. The victim informed Appellant she would be going back to the hospital the next day. Appellant responded she could go, but only for a little while, to which the victim responded that she would go for as long as she liked.

The confession further stated that the victim went to bed, and Appellant sat in the kitchen, writing a letter asking for forgiveness for what he was going to do. Then, Appellant went into the bedroom and continued to discuss the victim's desire to return to the hospital. During the

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

conversation, the victim told Appellant that her ex-husband had more rights than he did, because she had married her "ex" in a church. In the confession, Appellant stated that he told the victim that she was not allowed to go with her ex-husband. The victim said she was going, and to stop her if he could. Appellant said he would find a way not to let her go. The victim became upset and called the police.

Appellant's confession further states that he was looking for an extension cord, that he found one, and that he told her she could go with her ex-husband, but dead. Appellant stated that he put the extension cord around her neck and tightened it so she could not defend herself. She then appeared lifeless. After that, Appellant's confession stated that he took several sleeping pills, found a knife, and tried to cut his neck.

Appellant testified in a manner similar to the contents of his written confession, but with some notable differences. Appellant testified that, when he came into the bedroom and lay down, the victim suddenly got up and told him she was going with her ex-husband. When Appellant inquired whether she was asking for permission again, she responded that she was not and that she would be going with him, definitely. The victim told Appellant that he was not her husband, because they were not married in a church, that he was useless, and that he could not give her what her "ex" could. Appellant testified that the victim continued to taunt him and told him he was not any good any longer. Appellant said he was furious and terrified that his wife might leave him. Appellant also testified that, at the time of his wife's death, he was not in his "five senses" and he was not "aware of anything." Additionally, Appellant claimed that he did not realize that he had killed his wife, until police told him.

Appellant testified that the note which he wrote, asking for forgiveness for what he was going to do, referred to his plan to kill himself. Appellant further testified he wrote the note after he killed

his wife.

Appellant testified he was more unconscious than conscious when he left the hospital on June 25. Appellant did, however, remember the interview with Detective Ochoa. Appellant also remembered being advised to read his rights. However, Appellant disagreed with his written confession in that he claimed he did not say his problems with his wife started on Father's Day.

Dr. Cristina Cruz-Grost, a psychiatrist, testified for the defense that, when Appellant was a child in Mexico, his father would tie him to a donkey when going to the fields, because Appellant was a small child and could not hold onto the animal himself. When Appellant would ask his father why he had to be tied to the animal, his father would respond that it was so that Appellant would grow up to be a man. Dr. Cruz-Grost testified that this memory was the earliest memory to which Appellant had access. She also stated that, when the victim said Appellant was not any good any longer, was useless, and could not give her what she needed, it set off a chain of events in Appellant. She testified that the victim's words attached to Appellant's "deepest significance of his man—of his life, which was, that he wanted to be a man, a good man, a complete man."

Dr. Cruz-Grost testified that the medicine Appellant was on when he left the hospital could have caused him to be dizzy. Dr. Cruz-Grost stated that the medicine, in conjunction with his suicide attempt three days earlier, had placed Appellant in a debilitative state.

## II. DISCUSSION

In Issues Nos. One and Two, Appellant contends that the trial court erred by admitting his statement into evidence, because it was not a voluntary statement (Issue No. One), and that the jury erred in considering the confession, because the evidence showed it was involuntary (Issue No. Two). Specifically, Appellant objects to the voluntariness of the confession because, before discharging him, the hospital administered him a mixture of medications which, he claims, rendered

him incapable of making an independent statement.

Prior to trial, Appellant filed two motions to suppress the confession. A partial hearing was held on the motions, but it was not completed, and the Appellant apparently waived the motion to suppress hearing, with the intent that the issues would be raised before the jury at trial. At trial, when the State offered the confession into evidence, Appellant objected on the grounds that it had been involuntarily given and that it was inaccurate. The court overruled the objection and admitted the confession into evidence.

The court, however, instructed the jury that it was not to consider the confession, unless it found beyond a reasonable doubt that the confession was freely and voluntarily given. Statements of confession can be used as evidence against a defendant, if it appears that the confession was freely and voluntarily made, without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21. A confession is found to be involuntary or coerced when the totality of circumstances demonstrates that the confessor did not make the confession on his own free will. *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997). This Court has recognized some factors that may indicate a confession was not made of the defendant's free will, such as length of detention, incommunicado or prolonged interrogation, denial of access to a family member, refusal of a defendant's request to telephone a lawyer or family member, and physical brutality. *Licon v. State,* 99 S.W.3d 918, 924 (Tex. App.--El Paso 2003, no pet.).

In reviewing the voluntariness of a confession, almost total deference must be given to the trial court's determination of historical facts in a suppression hearing. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *O'Hara v. State*, 27 S.W.3d 548, 550 (Tex. Crim. App. 2000). The appellate court must also review the evidence in the light most favorable to the trial court's ruling and cannot reverse the trial judge's decision on the admissibility of evidence, absent a clear abuse

of discretion. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000). An abuse of discretion occurs when the trial court acts without reference to any guiding principles or acts unreasonably. *Fineron v. State*, 201 S.W.3d 361, 365 (Tex. App.--El Paso 2006, no pet.). If the trial court's findings are supported by the record, we are not at liberty to disturb them. *Green v. State*, 615 S.W.2d 700, 707 (Tex. Crim. App. [Panel Op.] 1980), *cert. denied*, 454 U.S. 952 (1981).

We review the trial court's application of the law under a *de novo* standard. *O'Hara*, 27 S.W.3d at 550. The trial court's ruling will be affirmed, if it is correct under any theory of law. *Romero*, 800 S.W.2d at 543; *Laca v. State*, 893 S.W.2d 171, 177 (Tex. App.--El Paso 1995, pet. ref'd).

Appellant testified that he was more unconscious than conscious when he gave his written confession. He explained that, although the written confession says that he wrote the note asking his children for forgiveness for what he was about to do before he murdered his wife, he actually wrote it after he had done so and that he was referring to his planned suicide. Appellant testified he did not know he had killed his wife until the police told him. However, Hector Sias, the paramedic, rebutted this testimony when he testified that Appellant, despite appearing groggy, admitted at the scene that he had murdered his wife.

Despite testimony from Appellant regarding claimed inaccuracies within the confession, the judge did not abuse his discretion in admitting it into evidence. The trial judge is best positioned to make credibility determinations about witnesses and testimony, so decisions made as to whether to admit evidence will be afforded great deference. *See Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007), *cert. denied*, ___ U.S. ____, 128 S. Ct. 1128 (2008) (discussing trial judge's role as credibility judge of witnesses in motion to suppress and the deference given to his ruling on the

motion).  In *Fineron*, 201 S.W.3d at 366, this Court found that discrepancies in testimony regarding the voluntariness of a confession were within the right of the trial judge to believe or disbelieve, and we did not reverse her determinations.

The trial judge acted permissibly in making credibility determinations as to Appellant's testimony versus his written confession, as well as believing or disbelieving his testimony compared with other witnesses' testimony.  Since the trial judge implicitly found that the confession was voluntary, he was free to disregard any testimony that may have alluded to inaccuracies in the confession.  We cannot say the trial judge abused his discretion in admitting the statement, despite Appellant's claims of inaccuracies.

We also find that, despite testimony that Appellant "could have been" in a debilitative state due to medication, the judge did not abuse his discretion when he admitted the confession into evidence.  Where a defendant claimed that he had made an involuntary confession, because he was intoxicated and intimidated by officers, but the claims appeared unsubstantiated by the record, the Court of Criminal Appeals refused to find an abuse of discretion and upheld the trial court's decision to admit the confession.  *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  The Court of Criminal Appeals has also stated, "Intoxication, while relevant, does not render a confession involuntary per se.  Instead, the question becomes whether the defendant's intoxication rendered him incapable of making an independent, informed decision to confess." *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997).

In *Kearney v. State*, 181 S.W.3d 438, 447 (Tex. App.--Waco 2005, pet. ref'd), a defendant who was on medication after surgery from a gunshot wound gave a confession.  The evidence indicated that the defendant was able to understand the questions and even chose not to answer one. The appeals court agreed with the trial court that the defendant's ability not to answer showed that

he knew and understood his rights. *Id.*

Similar to *Kearney*, in this case, Detective Ochoa testified that Appellant had pointed out spelling errors in the statement. This type of behavior shows enough physical and mental capacity to give an informed and voluntary statement and provided sufficient evidence for the trial judge to disbelieve Appellant's testimony. In the absence of excessive police coercion or other evidence showing that Appellant did not make the statement of his own free will, the judge and jury were well within their respective rights to disbelieve his testimony regarding inaccuracies in the written statement and to disbelieve the defense expert as to the effects of the medicine which was administered to Appellant in the hospital. This is especially true since the defense expert's testimony was speculative, in that she testified about the medications' "possibly" having had the debilitating effect. For the reasons stated above, we find that the judge did not abuse his discretion in admitting the confession and that the jury did not err in considering it. Issues Nos. One and Two are overruled.

In Appellant's third issue, he maintains that the jury erred by failing to find by a preponderance of the evidence that he caused Flor's death while he was under the influence of sudden passion arising from an adequate cause. The jury answered the special issue, "Do you find by a preponderance of the evidence that on the occasion in question, at the time of the commission of the offense for which the defendant is on trial, the defendant, Jose Pulido, caused the death of Florencia Pulido while Jose Pulido was under the immediate influence of sudden passion arising from an adequate cause?" in the negative.

The Penal Code provides, "At the punishment stage of a [murder] trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." TEX. PENAL CODE

ANN. § 19.02(d). When a defendant seeks appellate review of a jury's failure to make a finding on which the defendant has the burden of proof, such as an affirmative defense, the defendant invokes factual review jurisdiction. *Naasz v. State*, 974 S.W.2d 418, 421 (Tex. App.--Dallas 1998, pet. ref'd).

In conducting a factual-sufficiency review of the negative finding on sudden passion, we do not view the evidence "in the light most favorable to the prosecution." *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Rather, we look at all evidence in a neutral light and will reverse only if (1) the evidence is so weak that the finding seems clearly wrong and manifestly unjust or, (2) considering conflicting evidence, the finding, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *See Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). However, it is not enough that we may harbor a subjective level of reasonable doubt to overturn a finding that is founded on legally-sufficient evidence. *See id.* at 417. We cannot conclude that a finding is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted differently, had we been on the jury. *Id.* Nor can we declare that a conflict in the evidence justifies a new trial, simply because we may disagree with the fact finder's resolution of that conflict. *See id.* Rather, before ordering a new trial, we must first be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Id.* In conducting our factual-sufficiency review, we must also discuss the evidence which Appellant claims is the most important in allegedly undermining the finding. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Moreover, under factual-sufficiency reviews in this context, we defer to the fact finder's determination of witnesses' credibility and of the weight given to the evidence. *Cleveland v. State*, 177 S.W.3d 374, 388 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd), *cert. denied*, 547 U.S. 1073 (2006).

"Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). Sudden passion does not include feeling strange or upset. *Cleveland*, 177 S.W.3d at 391. "[I]n most cases, sudden passion is resolved exclusively by the jury's assessment of whether the witness is credible." *Id.* at 389. In instances where the defendant had a cooling off period of fifteen minutes or an hour, courts have not overturned the jury's negative finding on sudden passion. *White v. State*, 699 S.W.2d 607, 617 (Tex. App.--Dallas 1985, pet. ref'd) (ten or fifteen minutes); *Gaston v. State*, 930 S.W.2d 222, 226 (Tex. App.--Austin 1996, no pet.) (one hour). We have already determined that the judge did not err in admitting Appellant's confession, and that the jury did not err in considering it. If the jury did consider Appellant's confession, they may have determined that Appellant had a cooling-off period between the time when the victim first confronted him and when he subsequently murdered her. The jury may have also considered Appellant's first version of the events, in which he stated in his confession that he wrote a note asking his children for forgiveness for what he was about to do, before he killed his wife. If the jury believed the written confession, it may reasonably have concluded that Appellant planned to murder his wife.

While Appellant did provide testimony that countered his written confession, the jury is entitled to resolve discrepancies or conflicts between evidence and testimony. *Cleveland*, 177 S.W.3d at 391. The jury had the authority to review the evidence and to believe either (or neither) of Appellant's differing versions of events.

"Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool

reflection."[3] TEX. PENAL CODE ANN. § 19.02(a)(1).  As the Dallas Court of Appeals noted:

> Legally adequate cause requires some evidence of the condition of the accused's mind at the time of the offense.  Ordinary anger is not adequate cause.  The cause must be the kind that would produce anger, rage, resentment, or terror in a person of ordinary temper so the person is incapable of cool reflection.  Such responses in persons with special susceptibilities are not enough unless the cause would also produce such responses in an ordinary person.

*Naasz*, 974 S.W.2d at 423 (citations omitted).

This Court has held that voluntary manslaughter is "not available to one whose actual emotional responses are aberrational in this society." *Corral v. State*, 900 S.W.2d 914, 919 (Tex. App.--El Paso 1995, no pet.).[4]  Furthermore, we held, "Without legally adequate cause, no amount of subjective passion will justify submission of voluntary manslaughter." *Id.*  Penal Code section 19.02(a)(1) defines "adequate cause" by an objective standard; that is, whatever anger or rage is produced is measured by the person of ordinary temper.  *See Hernandez v. State*, 127 S.W.3d 206, 213-14 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd) ("causes that would not render the ordinary person's mind incapable of cool reflection do not constitute adequate cause").

In this case, Appellant did not have adequate cause, because his level of anger was not that of a person with an ordinary temper.  In *Corral*, this Court held that adequate cause for murder did not exist where a rock was thrown at the shooter's car and boys gestured gang signs to the shooter. *See Corral*, 900 S.W.2d at 919.  Fear of a spouse's leaving is not adequate cause.  Where one spouse discovered the other spouse's extramarital affair, there was not adequate cause for murder. *Bradshaw v. State*, 244 S.W.3d 490, 503 (Tex. App.--Texarkana 2007, pet. stricken).  Similarly, no

---

[3]  Both "sudden passion" and "adequate cause" were correctly defined in the jury charge.

[4]  In *Corral*, 900 S.W.2d at 919 n.2, this Court noted that "voluntary manslaughter" was abolished as a separate offense under the Penal Code in 1994 and that it is now "merely a punishment issue" under section 19.02(d).  The elements of "sudden passion" and "adequate cause," however, have been judicially considered in Texas since at least 1880.  *See McKinney v. State*, 8 Tex. App. 626 (1880), so voluntary manslaughter cases raising these elements may still be cited.

adequate cause arising from the immediate influence of sudden passion was found where a defendant's wife served him with divorce papers, and he subsequently stabbed her to death, while remaining calm and without becoming upset afterwards. *Cleveland*, 177 S.W.3d at 390.

Appellant testified he was terrified that his wife wanted to leave him and that he was angry and furious when she told him he was "no good anymore." The defense's expert witness, Dr. Cruz-Grost, testified that, when the victim told Appellant that he was no good, useless, and could not give her what she needed anymore, it triggered an emotion deep within him from his childhood. Dr. Cruz-Grost stated that the victim's words likely "set off a chain of events" in Appellant when he was accused of not being what he had striven his whole life to be. While Appellant may have felt insulted, angered, or dismayed, such a statement to a person of ordinary temper would not result in a murder.

Fear of separation would not cause a person of ordinary temper to kill his spouse. A reasonable fact finder could clearly consider Appellant's reaction to be aberrational. We therefore find that the jury's negative finding on sudden passion was not manifestly unjust. Issue No. Three is overruled.

### III. CONCLUSION

We affirm the judgment of the trial court.


KENNETH R. CARR, Justice

August 7, 2008

Before Chew, C.J., McClure, and Carr, JJ.

(Do Not Publish)